Patricia McDONNELL, Plaintiff,

v.

**CERTIFIED ENGINEERING & TESTING CO., INC.,** Defendant.

Civ. A. No. 94–10318–DPW.

United States District Court, D. Massachusetts.

July 31, 1995.

Kevin G. Powers, Boston, MA, for plaintiff.

M. Robert Dushman, Brown, Rudnick, Freed & Gesmer, Boston, MA, Catherine E. Reuben, Robinson & Cole, Boston, MA, for defendant.

### MEMORANDUM AND ORDER

WOODLOCK, District Judge.

### I.

Patricia McDonnell (McDonnell), brought the instant action against her former employer, Certified Engineering & Testing Co., Inc. (Certified) alleging that Certified dismissed her in November of 1991 immediately after she informed her supervisor that she was pregnant. This dismissal, McDonnell alleges, violated state and federal laws prohibiting discrimination based on gender and disability.

Certified has moved for summary judgment asserting that it terminated McDonnell as part of a management decision to eliminate her position. Certified contends that management had made the decision to terminate McDonnell before it became aware that she was pregnant and that it is only coincidental that she was laid off the same day she informed her supervisor that she was pregnant. Certified also argues that McDonnell has not demonstrated that her pregnancy qualifies her as "handicapped" and entitled to

protection of the anti-discrimination statutes prohibiting discrimination based on disability.

The question whether improper considerations caused McDonnell's termination cannot be resolved on a summary judgment record. The issue must be presented to the factfinder at trial for determination on the merits. Accordingly, I will deny defendant's motion for summary judgment.

## II.

Glenn Sylvester, Vice President and part owner of Certified (Complaint ¶ 6), hired McDonnell on December 8, 1986, (*id.* ¶ 4; *see also* Sylvester Dep. at 23). McDonnell served for nearly four years as a Director of Human Resources (Complaint ¶ 4); Certified acknowledges that she "performed her duties in a competent and professional manner." (Answer ¶ 5; Complaint ¶ 5.)

On November 19, 1990, McDonnell told Sylvester, her supervisor, that she was pregnant. (Complaint ¶ 6.) Minutes later, according to Sylvester, he informed Leonard Seale, Certified's President, that McDonnell was pregnant. (Sylvester Dep. at 27.) Several hours later, Seale asked to meet with McDonnell (Complaint ¶ 8; Ans. ¶ 8); Sylvester also attended this meeting (Pl.Ans. to Interrog. ¶ 5). "At the meeting, Mr. Seale congratulated the plaintiff for her pregnancy, and told her that she was being laid off as of November 23, 1990." (Complaint ¶ 8; Ans. ¶ 8.)

Certified contends that its decision to terminate McDonnell predated her announcement that she was pregnant. Sylvester testified that the issue of McDonnell's pregnancy was not a factor in the decision of whether to terminate her. (Sylvester Dep. at 64–65.) He also testified that McDonnell's termination was entirely unrelated to her performance. *Id.* at 25. Instead, Certified asserts, due to financial problems it had "instituted a program to lay off a number of its corporate personnel whose time could not be billed

directly to clients and who were considered as part of the corporate overhead." (Def.Mem. at 1.)

### A. *November 14, 1990 Directors' Meeting*

According to Certified, a recommendation was made by Certified's "foreign investors" to terminate McDonnell and several other employees at a November 14, 1990, Board of Directors meeting. *Id.* at 2. The minutes of that meeting indicate that such a recommendation was made. (Minutes 11/14/90 Board Meeting at 11.)[1] At one point during discovery, Certified indicated that it decided to terminate McDonnell at this meeting:

The decision to lay off the plaintiff was made at a meeting of the Board of Directors held in New York City on Wednesday, November 14, 1990, commencing at approximately 2:00 p.m. Participating in the meeting were Leonard Seale, Glenn Sylvester, Wayne Crandelmere, Calvin Thompson, Francois Carrette and Alain Thieffry.

(Def.Ans. to Interrog. No. 11.) However, Sylvester testified, based on his review of the minutes of the meeting, that no vote on the lay off question was taken. (Sylvester Dep. at 44.) He noted, however, that "layoffs, firings and so forth were handled by management. It wasn't required that we would have a Board of Directors' meeting to discuss a person or a[n] employee or employees that would be laid off." *Id.* at 45–46.

### B. *November 15 (?) 1990 Management Meeting*

Certified further asserts that at a subsequent meeting attended by Seale, Sylvester and Wayne Crandelmere, another Certified manager, a decision was made to lay off McDonnell, among others. (Def.Mem. at 2.) Although Sylvester did not recall the date of that meeting at his deposition (Sylvester Dep. at 46–47), he identified notes he took at that meeting that were dated November 15, 1990, *id.* at 50. Sylvester testified that the decision to lay off McDonnell occurred at this

---

1. The minutes indicate:

Specific recommendations on cuts were made by Mr. Thieffry. These included the release of Mr. Richard Holloway, IMS Manager; Ms. Patricia McDonnell, Human Resources Manager; and Mr. William Czar, Controller. It was also suggested that the Corporate secretarial staff be reduced to one or two persons. Mr. Thieffry also stated that the accounting department needed only four to five persons to work effectively[.]

(Minutes of 11/14/90 Board Meeting at 11.)

meeting. *Id.* at 48. Although the meeting notes are not entirely legible, they do contain a list of nine names under the heading "Corporate" and a column apparently indicating each named person's salary (in thousands). (Notes dated 11/15/90; Def.Mem.Ex. A–4.) [2] "Tricia" McDonnell is on the list; also included are Bill Czar, Dick Holloway, Deb Holland, Ginny (with the notation "1/2x"), Deb A. and Don (the latter two accompanied by the notation "assign to Weymouth"). *Id.* The salaries of these seven are tabulated, and below that line are listed "Lynn S." and Wayne (in place of the latter's salary is a "?"). *Id.* Sylvester testified that "[t]he decision was made to lay all of those people off who were on that list." (Sylvester Dep. at 48.)

## C. *November 19, 1990 Phase II Plan Memorandum*

Certified points to a memorandum from Seale to other Certified managers and investors to support its position that the decision to terminate McDonnell was made before she announced that she was pregnant. Seale's memorandum, dated November 19, 1990, referred to an attached "Phase II, Proposed Cost Reduction Plan" that "describes the cost reductions which we are implementing as a consequence of the decisions reached at the Board of Directors Meeting" the previous week. (Seale Cover Mem.; Def.Mem.Ex. A–3.) The Phase II Proposed Plan indicated that the actions it described were "to be implemented during the week of 19 November 1990." (Phase II Plan at 1; Def. Mem.Ex. A–3.) The Plan's section on "Corporate Staff Reductions" indicated that "[t]he following [seven] employees will be laid off, or have the time they charge to the Corporate payroll reduced, effective Friday, 23 November, 1990:"

| Name | Position | Annual Salary Reduction | |
| --- | --- | --- | --- |
| W. Czar | Controller | $ 53,996 | |
| R. Holloway | Manager, Data Systems | 47,249 | |
| T. McDonnell | Manager, Human Resources | 18,982 | (1) |
| D. Holland | Receptionist | 18,780 | (2) |
| L. Simcox | Marketing Analyst | 28,000 | |
| C. Falletti | Secretary | 11,929 | (3) |
| G. McGrath | Secretary | 12,896 | (4) |
| Annual Cost Reduction | | $ 191,772 | |
| Weekly Cost Reduction | | $ 3,688 | |

*Id.* The "(1)" next to McDonnell's salary indicated that she was then "working part-time @ 3 days/week." *Id.* The notations for Holland, Falletti and McGrath indicated that each of those employees would have all or a portion of their salaries charged to "Weymouth" and, in addition, Holland would be cut back to part-time. *Id.*

While the list of employees identified in the notes from the 11/15/90 meeting and the subsequent Phase II Proposed Plan are similar, they are not identical. I note the following differences. Deb A., Don and Wayne all appear on the 11/15 list but were not listed on the Plan as part of the 11/23/90 layoffs. Also, C. Falletti, who appears on the Plan and was laid off, was not on the 11/15/90 list.[3]

Based on the information provided in the November 19, 1990 Plan, Sylvester's testimony that "[t]he decision was made to lay all of those people off who were on [the November 15, 1990] list" (Sylvester Dep. at 48) is not entirely accurate. Of the nine people included on the November 15 list, only four—Czar, Holloway, McDonnell and Simcox—were laid off. A fifth, Holland, was reduced to part-time. "Ginny" McGrath, who appeared on

---

**2.** Next to the heading "Corporate," is a notation that appears to read: "(pay difference in [two illegible words])." (Notes dated 11/15/90.) No one offers an explanation of this notation.

**3.** I presume that "Lynn S." is "L. Simcox" and "Ginny" is "G. McGrath."

the November 15 list, was not laid off, her salary was simply shifted from the corporate payroll. And, as mentioned above, Deb A., Don and Wayne, who were on the 11/15 list, were not laid off.

At the summary judgment motion hearing, the parties were asked to provide the court with greater specificity regarding the November 23, 1990 layoffs. The parties stipulate as follows:

> According to the defendant's records, the following individuals, mentioned as part of the "Phase II Proposed Cost Reduction Plan" were all women: D. Holland, L. Simcox, C. Falletti, and G. McGrath.
>
> With respect to the two males listed in that same document (W. Czar and R. Holloway), Mr. Czar was not re-hired. The plaintiff believes that Mr. Holloway was re-hired, possibly as a consultant. The defendant's position is that it subsequently engaged Mr. Holloway on a part-time consulting basis....
>
> [The plaintiff's] statement that "two other males were laid off but hired back," referred to R. Holloway ... and another individual named Demitrius Douros, who was laid off several weeks before the plaintiff was laid off and who was rehired at some time after the plaintiff was laid off.

(Stipulation of 5/5/95, ¶¶ 1–3 (citation omitted).)[4] Following the submission of this stipulation, Certified filed an affidavit indicating that Holloway, the former computer information systems manager, worked as a part-time consultant for Certified following his layoff in November of 1990. In 1991, according to this affidavit, Holloway worked 722 hours; in 1992, he worked 530 hours; in 1993 he worked 149 hours; and in 1994, his final part-time year with defendant, he worked 6 hours. (Douros Aff. ¶ 3; Docket No. 20.)

Sylvester testified that he had received a copy of the Phase II Proposed Plan but did not recall the date he received it. (Sylvester Dep. at 55.) He added: "I'm sure [I received it] right around the time that it was dated which was November nineteenth, 1990." *Id.* Sylvester testified that he did not recall if he had gotten this Plan before McDonnell told him that she was pregnant. *Id.*

### D. *Management Encounters with McDonnell*

Sylvester testified that when McDonnell told him that she was pregnant on November 19, 1990, he knew that she was going to be laid off. (Sylvester Dep. at 27.) Nonetheless, he did not tell her that she would be laid off. *Id.* at 26. As noted above, as soon as McDonnell told him she was pregnant, Sylvester notified Seale. *Id.* at 27–28. Sylvester reports that he cautioned Seale about the risks of laying off McDonnell on the same day she informed them of her pregnancy. He testified: "Knowing that there were going to be layoffs that day, [I said] that that could cause a problem and [Seale] said, you know, we still have to go through with it." *Id.* at 28.

McDonnell says that the day after she was terminated, November 20, 1990, Sylvester told her "that he did not know [she] was being laid off until the November 19, 1990 meeting." (Pl.Ans. to Interrog. ¶ 5.) At his deposition, Sylvester denied that he had made such a statement. (Sylvester Dep. at 29.) McDonnell alleges that Sylvester's secretary, Elizabeth Hurst, also told her on November 20, 1990, that Sylvester had told Hurst that he had not known of McDonnell's pending termination until the meeting on the 19th. (Pl.Ans. to Interrog. ¶ 5.) Sylvester denied having had this conversation as well.

---

4. McDonnell alleged that the majority of employees laid off were female—listing twelve (12) women who were laid off. (Pl.Ans. to Interrog. ¶ 4.) She also stated that, "Only one male was laid off permanently. Two other males were laid off but hired back." *Id.* These assertions appear to cover layoffs in addition to those that occurred on November 23, 1990. McDonnell has not provided the time period over which these layoffs occurred. Overall, Certified's 1991 Equal Employment Opportunity (EEO) Report indicates that of the 27 "officials and managers" as of 1991, 2 (or 7.4%) were women; of the 78 "professionals" 17 (or 22%) were women; of the company's other 150 employees, 42 (or 28%) were women, almost all of whom were "office and clerical" workers. Overall, of 255 employees, 61 (or 24%) were women.

(Sylvester Dep. at 28.)[5] McDonnell also reports that she spoke with Seale on November 20, 1990. She states that Seale "said goodbye, and that now that [McDonnell] was pregnant, she had more important things to be concerned about." (Pl.Ans. to Interrog. ¶ 5.)

McDonnell states that she received assurances of her job security before becoming pregnant. McDonnell asserts that during a meeting with Sylvester in September of 1990, Sylvester reassured her "that should there be any future organizational changes, he would see to it that Plaintiff was not laid off." (Pl.Ans. to Interrog. ¶ 5.) McDonnell states that she received similar assurances from Seale who, she says, indicated "that he felt she was a very valuable employee, that she had a career with CETCO, and that CETCO would never want to lose her." *Id.*

### E. Legal Proceedings

McDonnell filed the instant complaint in Norfolk Superior Court for the Commonwealth of Massachusetts on October 22, 1993. (State Court Docket).[6] McDonnell's five-count complaint alleges discrimination: based on gender and pregnancy in violation of Mass.Gen.L. ch. 151B (Count I); based on handicap (pregnancy) in violation of ch. 151B (Count II); based on sex in violation of Mass. Gen.L. ch. 93, § 102 (Count III); based on handicap in violation of ch. 93, § 103 (Count IV); and based on gender and pregnancy in violation of 42 U.S.C. § 2000e et seq. (Count V). Certified filed a Notice of Removal in this Court on February 16, 1994. (Docket No. 1.)

### III.

Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue will be considered trialworthy only if "there is enough competent evidence to enable a finding favorable to the non-moving party." *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993). Further, "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995) (citing *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989)), *cert. denied* —— U.S. ——, 115 S.Ct. 2247, 132 L.Ed.2d 255.

### A. Discrimination Based on Gender and/or Pregnancy

McDonnell presents claims of discrimination based on gender and/or pregnancy based on Mass.Gen.L. ch. 151B (hereinafter ch. 151B) (Count I), Mass.Gen.L. ch. 93, § 102 (hereinafter § 102) (Count III), and 42 U.S.C. § 2000e et seq. (hereinafter Title VII) (Count V).

#### 1. Chapter 151B and Title VII

The Massachusetts antidiscrimination statute, ch. 151B, makes it unlawful:

> For an employer, by himself or his agent, because of the race, color, religious creed, national origin, sex, sexual orientation, ... or ancestry of any individual ... to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

Chapter 151B, § 4(1).

> Similarly, federal law, Title VII, provides:

> It shall be an unlawful employment practice for an employer—(1) ... to discharge any individual, or otherwise to discriminate

---

**5.** I note but decline to consider as competent evidence the Hurst statement as reported by McDonnell. In order to avoid hearsay objection, it would appear necessary at a minimum that Hurst herself testify regarding Sylvester's comment.

**6.** McDonnell alleges, summarily, that she filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) and "has satisfied all jurisdictional prerequisites under M.G.L. ch. 151B." (Complaint ¶ 11.) Certified does not contest her exhaustion of administrative remedies.

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

42 U.S.C. § 2000e–2(a). As the Massachusetts Supreme Judicial Court explained recently, in *Beal v. Board of Selectmen of Hingham,* "Because '[t]he analysis of a [gender] discrimination claim is essentially the same under the State and Federal statutes,' we [can] combine our discussion of both [Title VII] and [Chapter 151B] claims." 419 Mass. 535, at 544 n. 5, 646 N.E.2d 131 (1995) (citation omitted). *Cf. Blare v. Husky Injection Molding Systems Boston, Inc.,* 419 Mass. 437, 442–446, 646 N.E.2d 111, 115–17 (1995) (outlining differences between federal and state law at the third stage of the analysis).

Claims of employment discrimination are analyzed with a burden-shifting approach first articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). The First Circuit recently reiterated that this framework "allocates burdens of production and orders the presentation of evidence so as 'progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.'" *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir.1995) (citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1095 n. 8, 67 L.Ed.2d 207 (1981)).

█ The *McDonnell Douglas* paradigm begins by placing the burden on the plaintiff to outline a *prima facie* case of discrimination. *Id.* As explained in *Woodman,* "The required prima facie showing is not especially burdensome and once established, gives rise to a rebuttable presumption that the employer engaged in intentional ... discrimination." *Id.* (citation omitted.) Once a *prima facie* case is established, the employer must produce evidence that the employment action was based on nondiscriminatory grounds. *Id.*

If the defendant articulates nondiscriminatory grounds, "[a]t the third and final stage, plaintiff must produce sufficient evidence, direct or indirect, to show that the reasons advanced by the employer constitute mere pretext for unlawful discrimination." *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 260 (1st Cir.1994). The standard for satisfying this "rebuttal case" varies somewhat under federal and state law. In *St. Mary's Honor Center v. Hicks,* ── U.S. ──, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court addressed a situation in which the factfinder disbelieved the defendants' proffered "nondiscriminatory reasons" for its treatment of the plaintiff.[7] Justice Scalia, for the Court, noted that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." 113 S.Ct. at 2749. However, the Court continued, a determination that a defendant's proffered reasons for its action are untrue does not compel judgment for the plaintiff. *Id.* This holding has been interpreted to require a Title VII plaintiff to prove "pretext plus." *See, e.g., Hicks,* 113 S.Ct. at 2762 (Souter, J., dissenting); *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1082–1083 (6th Cir.1994).

Recently, in *Blare,* 419 Mass. at 442–446, 646 N.E.2d 111, the SJC explicitly rejected the "pretext plus" requirement under Title VII as established by *Hicks* for claims brought under ch. 151B. The SJC explained:

Prior to the Supreme Court's recent decision in [*Hicks*], the Federal circuit courts of appeals were divided into "pretext plus" and "pretext only" jurisdictions. Those in favor of the pretext plus position argue that the presumption of intentional discrimination created by the plaintiff's prima

---

7. In *Hicks,* after a bench trial in District Court, the judge concluded that "the reasons [the defendants] gave were not the real reasons for [the plaintiff's] demotion and discharge." 113 S.Ct. at 2748. The trial judge "nonetheless held that [the plaintiff] had failed to carry his ultimate burden of proving that his race was the determining factor in [the defendants'] decision first to demote and then to dismiss him." *Id.* The Eighth Circuit reversed "on the ground that '[o]nce [the plaintiff] proved all of [the defendants'] proffered reasons for the adverse employment actions to be pretextual, [the plaintiff] was entitled to judgment as a matter of law.'" *Id.*

facie case "bursts" when the defendant satisfies its second-stage burden of production, and requires a plaintiff in the third stage to provide that intentional discrimination was the basis of the hiring decision. The pretext only rule is similar to the pretext plus position in that the presumption created by a prima facie case drops from the case if the defendant satisfies its burden of production, but differs in the third stage in that a plaintiff who has established a prima facie case and persuaded the trier of fact that the employer's articulated justification is not true but a pretext, is entitled to judgment. Massachusetts is a pretext only jurisdiction.

419 Mass. at 442–43, 646 N.E.2d at 115–16 (footnotes omitted). After reviewing the holding and reasoning of *Hicks,* the SJC concluded:

> We think the better policy is to remain with our own precedent that, once a plaintiff has established a prima facie case and further shows either that the employer's articulated reasons are a pretext or by direct evidence that the actual motivation was discrimination, the plaintiff is entitled to recovery for illegal discrimination under G.L. c. 151B.

419 Mass. at 444–45, 646 N.E.2d at 117. These differing federal and state standards at the final, "pretext" stage of the analysis may impact McDonnell's ultimate ability to make out a claim. Definitive determination, however, is premature upon consideration of summary judgment motions.

The Court in *Woodman* explained the applicability of the burden-shifting framework on cases at summary judgment:

> Since neither credibility issues nor other factual matters in genuine dispute are to be resolved under it, 'the *McDonnell Douglas* framework ... is no longer relevant' once the defendant-employer has met its burden of production at the second

stage.... At that point, the defendant-employer's motion for summary judgment cannot succeed if the plaintiff-employee, with whom the ultimate burden of persuasion remains throughout, has proffered sufficient admissible evidence, if believed, to prove by a preponderance of the evidence, each essential element in a prima facie case and that the challenged employment action was merely a pretext for impermissible ... discrimination.

51 F.3d at 1091–92 (citations omitted).

### a. *The Prima Facie Case*

█ Because circumstances giving rise to complaints of employment discrimination vary widely, the elements of a *prima facie* case are elastic enough to be formulated to best fit the circumstances alleged. *See Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 154 (1st Cir.1990). ("The *prima facie* case method conceived in *McDonnell Douglas* and nurtured in *Burdine* was 'never intended to be rigid, mechanized, or ritualistic.' "). The circumstances of this case fit imperfectly into the various *prima facie* models utilized in most other cases. In *Beal,* Justice Nolan outlined a "standard" *prima facie* case for claims of gender discrimination:

> In order to establish a prima facie case of gender discrimination resulting in the termination of employment, the plaintiff must establish that (1) she is a member of a protected group; (2) she was capable of performing the job at an acceptable level; (3) she was terminated; and (4) her employer sought a replacement with similar qualifications.

419 Mass. at 544, 646 N.E.2d at 138 (citations omitted); *see also Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 15 (1st Cir.1994) (outlining a similar *prima facie* case under Title VII).[8] The fourth element of this model does not suit the circumstances of McDonnell's

---

**8.** It should be noted that First Circuit cases have explicitly held, in the context of termination, that a Title VII plaintiff need not prove that her position was filled by someone not in her protected category. Judge Selya wrote:

> [I]n a case where an employee claims to have been discharged in violation of Title VII, she can make out the fourth element of her prima facie case without proving that her job was

filled by a person not possessing the protected attribute. Put another way, while the attributes of a successor employee may have evidentiary force in a particular case, a complainant can satisfy the fourth prong of her prima case simply by showing that, as here, the employer had a continued need for "someone to perform the same work after [the complainant] left."

*Cumpiano,* 902 F.2d at 155.

case because her position was eliminated, and no replacement was sought. Still, if her dismissal was based on illegal gender discrimination, she must be able to advance her claim.

*Woodman,* an age discrimination case, outlined a formulation of the fourth element of the *prima facie* case in claims based on reductions in force. Judge Cyr wrote: "since the challenged action was part of a *reduction in force,* [the plaintiff must show that] [the employer] did not treat age neutrally *or* it retained younger persons in the same position." 51 F.3d at 1091 (emphasis in original) (citing *Goldman,* 985 F.2d at 1117); *see also LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 842 (1st Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). In a gender discrimination context, the comparable showing would require the plaintiff to show that the employer did not undertake the reduction in force in a gender neutral manner, or, that it retained employees of the opposite gender in the same position. In *Woodman,* the comparison was made between the employee discharged and employees who performed the same job who were retained.

Although the instant case arguably involves a reduction in force, the *Woodman* formulation is not entirely helpful because Certified did not employ any other people in the same job category as McDonnell. Thus, the question may be framed alternatively as whether Certified's treatment of McDonnell should be evaluated in the context of the entire group of people discharged, and the entire work force retained (as she argues) or whether her treatment should be evaluated in the context of the other managers discharged and the other managers retained (as Certified argues). However, because the potential sampling of persons against which to compare McDonnell's treatment is so small as to be statistically irrelevant, a slightly different and more tailored evaluation is necessary.[9]

A recent 10th Circuit case, analyzing an age discrimination claim, offered the following formulation. It wrote:

> In reduction in force cases ... a plaintiff may demonstrate the fourth element by producing "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." The fourth element may also be shown by circumstantial evidence that a plaintiff was treated less favorably than younger employees.

*Jones v. Unisys Corp.,* 54 F.3d 624, 630 (10th Cir.1995) (citations omitted). I find *Jones* helpful for purposes of analysis here.

The parties agree that McDonnell satisfies the first three elements of the *prima facie* case. (Pl.Mem. at 7; Def.Mem. at 4.)[10] However, they dispute the last element of the *prima facie* case. Because the relevant group of which McDonnell was a part was extremely small—arguably containing only herself—for the purposes of this case, I will not strictly hew to the reduction in force formulation set forth in *Woodman* and *Le-*

---

9. I note the unavoidable restrictiveness created when the reduction in force *prima facie* formulation is applied to reductions involving small numbers of people. In these circumstances, some courts have questioned plaintiffs' offerings regarding the fourth element—that the employer did not conduct the layoffs gender neutrally or that men were retained in the same position. As the First Circuit wrote,

> We ... question whether a company can be said not to treat age neutrally as a matter of law merely because two of the three people it discharges pursuant to a reduction in force belong to the protected class. A sample of three is a small number from which to draw deductions of this sort.

*LeBlanc,* 6 F.3d at 844. Such a holding may effectively foreclose the claim of a plaintiff because of the small statistical pool in which he or she experiences an adverse employment action, and is consequently unable to make a sufficient statistical proffer to fit within the formulation the courts have devised. In order to address the comparative evaluation concerns of the fourth *Woodman* category, without making a statistical showing an evidentiary necessity, a different formulation is appropriate.

10. McDonnell is a member of a protected class because she is a woman and because she was pregnant. *See* 42 U.S.C. § 2000e(k) ("The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, child birth, or related medical conditions[.]"). In addition, she was capable of performing her job and she was terminated.

*Blanc.* Rather, I will adapt *Jones* to this case. To make out the fourth element of the prima facie case McDonnell must present evidence that the layoff was not undertaken in a gender neutral manner or otherwise present evidence from which a factfinder might reasonably conclude that the employer intended to discriminate on the basis of gender or pregnancy in reaching its decision to terminate her.

■ McDonnell's strongest evidence regarding the fourth element of the *prima facie* case lies in the timing of her dismissal. She was notified of her layoff the same day and after she told her supervisor of her pregnancy. This timing raises the spectre that Certified's final termination decision was decisively motivated by McDonnell's pregnancy, a gender based condition.[11]

Bearing in mind that "[t]he required prima facie showing is not especially burdensome," *Woodman,* 51 F.3d at 1091, I find that McDonnell has satisfied the fourth element of her *prima facie* case. McDonnell was notified that she would be terminated immediately after informing her supervisor of her pregnancy, a gender based physical condition. A rational factfinder could conclude, but would not be required to do so, that the termination decision was as a result of that gender related circumstance.

### b. *Certified's Response*

■ Having satisfied the *prima facie* case, McDonnell shifts the burden of production to Certified, thereby obligating Certified to "produce sufficient competent evidence, 'taken as true,' to permit a rational factfinder to conclude that there was a 'nondiscriminatory reason,' for the challenged employment action, thereby displacing the legal presumption of intentional discrimination generated by the plaintiff-employee's prima facie case." *Woodman,* 51 F.3d at 1091 (citations omitted); *see also Wheelock College v. MCAD,* 371 Mass. 130, 138, 355 N.E.2d 309, 314 (1976) (holding that "an employer must not only give a lawful reason or reasons for its employment decision but also must produce credible evidence to show that the reason or reasons advanced were the real reasons.")

Certified proposes that it satisfies its burden as follows:

At the time that the plaintiff's job was eliminated, the defendant was in serious financial straits. Its overseas investors were threatening to cease supporting it, which would have driven it into bankruptcy, unless it could reduce its costs by eliminating non-billable corporate overhead positions; and it was for that reason that [plaintiff's position] was slated for reduction, together with the positions of two corporate managers (the controller and the manager of data systems, both of whom were males).... [T]he decision to lay off the plaintiff was made for valid economic reasons before anyone knew she was pregnant.

(Def.Mem. at 6.) Certified further asserts:

The defendant has provided ... evidence that the decision to terminate the plaintiff was first discussed on November 14, and was finally determined on November 15, 1990, before the plaintiff had announced her pregnancy, and that the decision was made by people who were not aware that she was pregnant. The defendant has also

---

**11.** McDonnell in addition asserts that, overall, Certified's terminations were not undertaken in a gender-neutral manner and disproportionately effected women. (Pl.Ans. to Interrog. # 4.) Certified terminated five women and two men effective November 23, 1990. (Stipulation ¶¶ 1, 2.) Later, one of these male managers was rehired as a part-time computer consultant, *see* n. 4 *supra* and accompanying text. (Douros Aff., Docket No. 20; *Id.* ¶ 2.) Of the three terminated managers, McDonnell was the only woman. I find, however, this statistical evidence inadequate to support a disproportionate impact claim.

McDonnell also asserts that she has presented evidence that non-disabled, male employees "do-

ing the same or similar work were retained." (Pl.Mem. at 7.) However, the "retained" employees were employees primarily engaged in other work who "picked up" McDonnell's job functions in addition to their own. The circumstances of this case do not fit this element of the *Woodman* analysis regarding other, retained employees.

McDonnell also states that in her "role as Manager of Human Resources, she was privy to a constant undercurrent that the female employees were not treated equally to male employees. Females left the company for this reason, including Susan Kline, Lisa Campe, and Holly Stanga." (Pl.Ans. to Interrog. # 4.) This assertion is not sufficiently supported by competent evidence to support McDonnell's claim.

produced undisputed evidence that the plaintiff's pregnancy, because it was not known, was not discussed in connection with the decision to terminate her, nor did it play any role in that decision.

*Id.* at 7. I conclude that defendant's proffer is sufficient to rebut McDonnell's *prima facie* case because, if "taken as true" a rational factfinder could find that the decision to terminate McDonnell was based on nondiscriminatory reasons.

#### c. *Pretext*

■ As noted above, the inquiry is not yet complete. McDonnell retains the opportunity to argue that the defendant's position is pretextual and designed to mask discriminatory action. In so doing, she "may rely upon the same evidence" as she did in establishing her prima facie case. *Woodman,* 51 F.3d at 1092. McDonnell rests her argument principally on the "strong coincidence" of the timing of her firing and inconsistencies in Certified's representations regarding when the termination decision was made.

McDonnell urges that Certified's knowledge (or lack thereof) of her pregnancy at the time it decided to terminate her remains a genuine issue of material fact in dispute. (Pl.Mem. at 8.) McDonnell writes:

> [T]here is evidence that Defendant's version of events is a sham. Defendant argues that the decision to lay off Plaintiff occurred at a November 15, 1990 meeting in which Glen Sylvester was present.... However, on November 20, Glen Sylvester told Plaintiff that he had not known she would be terminated until the November 19 meeting.

*Id.* at 9–10. As noted earlier, Sylvester denies that he made such a statement to McDonnell on November 20. (Sylvester Dep. at 29.) But at this stage in the proceedings, McDonnell's construction of the evidence must be accepted.

McDonnell also asserts that other inconsistencies show that Certified's offered version of events is unreliable. She notes the discrepancies in when Certified asserts the layoff decision was made—once stating that the decision was made at the Board meeting (Def.Ans. to Interrog. No. 11), and on other occasions stating it was made at the meeting on the 15th (Sylvester Dep. at 48; Def.Mem. at 2). In addition, I note that it appears unlikely that a final decision was made on the 15th because the layoff decisions announced the following week are somewhat different. *See* discussion *supra* part II.C.

Many of the critical events in the case at bar occurred, or are stated to have occurred, on November 19, 1990. That is the day McDonnell announced her pregnancy, that is the day McDonnell was terminated, and that is the day Seale distributed his memorandum indicating that McDonnell was among the group to be terminated. McDonnell urges that this timing demonstrates that Certified's response is pretextual.

There is evidence that supports Certified's claim that a recommendation to the board was made that McDonnell's position be eliminated before she announced her pregnancy. Certified provides evidentiary support that a subsequent manager's meeting was also, at the very least, considering this move. However, there are inconsistencies in chronologies of events offered by Certified as well as a disparity between the reports of the November 15 meeting and the November 19 memorandum/November 23rd layoffs. I do note that throughout, the managerial layoffs remained the same; McDonnell, Czar and Holloway were all recommended for layoff on the 14th, appeared on the list made the 15th, and were laid off pursuant to Seale's memorandum of the 19th.

Nonetheless, McDonnell has offered sufficient evidence to put into question when the decision to terminate her was made and thus its motivating cause. It cannot be determined, at this juncture, if the decision to terminate her was made before she announced her pregnancy or after and as a result of that announcement. Consequently, I will deny Certified's motion for summary judgment on McDonnell's claims of gender and pregnancy discrimination based on ch. 151B and Title VII.

#### 2. *Mass.Gen.L. ch. 93, § 102*

■ McDonnell alleges that she was terminated because of her gender and pregnan-

cy in violation of Mass.Gen.L. ch. 93, § 102. (Complaint ¶ 19.) Together, ch. 93, § 102 and ch. 93, § 103, taken up below, part III. B.2., constitute the Massachusetts Equal Rights Act (MERA). This statute provides, in part:

> All persons within the commonwealth, regardless of sex, race, color, creed or national origin, shall have ... the same rights enjoyed by white male citizens, to make and enforce contracts....

Mass.Gen.L. ch. 93, § 102(a).

MERA is modeled on 42 U.S.C. §§ 1981 and 1982, which codify the Civil Rights Act of 1866. *See Frankina v. First Nat'l Bank of Boston,* 801 F.Supp. 875, 880 (D.Mass.1992), *aff'd* 991 F.2d 786 (TABLE); Stephen P. Johnson, *The 1989 Massachusetts "Equal Rights Law": A Short History,* Boston B.J., March/April 1990, at 17. This statute was enacted at a time when the Supreme Court appeared to be considering dramatically narrowing § 1981's reach, specifically, by questioning its applicability to private actors. *See* Johnson, *supra,* at 17; *Patterson v. McLean Credit Union,* 485 U.S. 617, 108 S.Ct. 1419, 99 L.Ed.2d 879 (1988) (per curiam opinion ordering reargument on the question of "Whether or not the interpretation of 42 U.S.C. § 1981 adopted by this Court in *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), should be reconsidered?")

Section 102 further provides:

> A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that any individual is denied any of the rights protected by subsection (a).

*Id.* § 102(c).

Certified asserts that McDonnell cannot pursue her claim under ch. 93, § 102, as well as her disability claim under ch. 93, § 103, "because those claims are pre-empted by the parallel provisions of G.L. c. 151B." (Def.Mem. at 10.) While this reading of the interplay between ch. 151B and ch. 93 is widely shared even by those dissatisfied by the result, *see* Phyllis Bauman, *Case & Statute Comment: Civil Rights—Availability of Remedies: Mass. Equal Rights Act—G.L.M. C.151B,* 80 Mass.L.Rev. 39 (1995), I do not find the issue of preemption definitively resolved.

In *Charland v. Muzi Motors, Inc.,* 417 Mass. 580, 631 N.E.2d 555 (1994), the case upon which Certified relies, the SJC held that a person pursuing a discrimination claim under §§ 102 or 103, that would also be actionable under ch. 151B, must first exhaust administrative remedies. The Court writes:

> We hold that, where G.L. c. 151B is applicable, employees alleging discriminatory conduct by their employer must comply with the administrative requirements of c. 151B and failure to do so precludes actions by employees based on the equal rights act.

417 Mass. at 581, 631 N.E.2d at 557. The clear implication of this holding is that a plaintiff who *has* complied with ch. 151B's administrative requirements, can pursue a claim under ch. 93, § 102. Several months after rendering its opinion in *Charland,* the SJC again indicated its acceptance of the principle that a plaintiff could bring a claim under both ch. 93, § 102 and 151B, this time in a claim based on allegations of gender/pregnancy discrimination. *Dalis v. Buyer Advertising, Inc.,* 418 Mass. 220, 636 N.E.2d 212 (1994) (holding, *inter alia,* that the plaintiff was entitled to a jury trial on both her ch. 151B and ch. 93, § 102 claims).[12] The dual applicability of MERA and ch. 151B mirrors the long standing relationship, in federal law, between Title VII and 42 U.S.C. § 1981. *See Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975) ("the remedies available under Title VII and under § 1981, although related, and although di-

12. In *Woods v. Friction Materials, Inc.,* 30 F.3d 255 (1st Cir.1994), the First Circuit indicated its view that §§ 102 and 103 are preempted by ch. 151B. However, the Court heard oral argument on this case on April 5, 1994, just over two weeks before *Charland* was issued. Although *Woods* was released on July 29, 1994, it does not cite to *Charland,* or to *Dalis,* which had just been decided on July 11, 1994. Thus, *Woods* apparently did not consider the SJC's post-argument pronouncements on this issue.

rected to most of the same ends, are separate, distinct, and independent")[13]

In the case at bar, McDonnell asserts that she has exhausted her administrative remedies by filing her complaint with the Massachusetts Commission Against Discrimination (MCAD). (Complaint ¶ 11). Certified does not contest this fact. Thus, I find she is not barred from pursuing her claims based on §§ 102 and 103.

Perhaps due to the relatively recent enactment of § 102,[14] there is a dearth of case law construing this section. No fixed standard for assessing these claims has developed. As noted above, the statute indicates that a "totality of the circumstances test" should be applied to assess claims. Mass.Gen.L. ch. 93, §§ 102(c), 103(c). The import of this standard, however, remains unclear.

In *Frankina v. First National Bank of Boston*, Judge Caffrey found that a § 103 claim should be analyzed with the same burden shifting paradigm utilized under ch. 151B and federal discrimination claims, both of which employ an intent requirement. 801 F.Supp. 875, 880 (D.Mass.1992), *aff'd* 991 F.2d 786 (1st Cir.1993) (TABLE).

Alternatively, one commentator urges a discriminatory effect standard based on the "totality of the circumstances" standard of proof for MERA claims. She explains:

> The Equal Rights Act explicitly incorporates a "totality of the circumstances" approach to proving discrimination claims. The language derives from the 1982 amendments to the Voting Rights Act of 1965, and was added to that statute in

response to the Supreme Court's 1980 holding in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (plurality opinion), requiring proof of purposeful racial discrimination to establish a voting rights violation and thus rejecting claims based on the foreseeable discriminatory effect of vote dilution among identifiable racial groups. In 1986 [in *Thornburg v. Gingles,* 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986),] the Supreme Court accepted and applied Congress' new totality of the circumstances standard, noting:

> > Congress substantially revised § 2 to make clear that a violation could be proven by showing discriminatory effect alone and to establish as the relevant legal standard the "results test," applied by this Court . . . and by other federal courts before *Bolden.*

> Thus, . . . the 1989 Equal Rights Act explicitly embodies a "discriminatory effects" or "totality of the circumstances" test.

Marjorie Heins, *Massachusetts Civil Rights Law,* 76 Massachusetts Law Review 77, 86–87 (June 1991) (citations omitted).[15] The applicability of the totality of the circumstances test to disparate treatment cases is less straight forward, but would, in any event, if different at all from the *McDonnell Douglas* burden shifting analysis, yield a more generous result for the plaintiff. *See* Johnson, *supra*, at 18.

The "employment practice" challenged here is Certified's decision to eliminate corporate employees who were not chargeable to specific projects. This decision had the

---

**13.** It should be noted that after rehearing, the Supreme Court, in *Patterson v. McLean Credit Union,* held that, unlike Title VII, racially discriminatory conditions of employment are "not actionable under § 1981, which covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process." 491 U.S. 164, 179, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989). The Court noted, however, that "there is some necessary overlap between Title VII and § 1981, and . . . where the statutes do in fact overlap we are not at liberty 'to infer any positive preference for one over the other.' " *Id.* at 181, 109 S.Ct. at 2375 (citing *Johnson v. Railway Express,* 421 U.S. at 461, 95 S.Ct. at 1720).

**14.** Section 102 was enacted in 1989 and Section 103 was enacted one year later, in 1990.

**15.** Given the evolution and highly specialized analyses in the voting context, the Voting Rights Act's "totality of the circumstances test" is of only marginal use in the case at bar. *See, e.g., Miller v. Johnson,* — U.S. —, —, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995) ("The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.")

"impact" of terminating one female manager (McDonnell) and two male managers (Czar and Holloway) or one pregnant woman and two men. It also had the overall impact of terminating the employment of five women and two men (or one pregnant women and six other (apparently) non-pregnant employees). This "proof," however, is of questionable value in determining whether the decision to eliminate corporate overhead employees, although neutral on its face, had the effect of discriminating against women in general or pregnant women in particular.

■ Although this case does not fit well into a disparate impact model, McDonnell's disparate treatment claim fares better. As indicated earlier, McDonnell's claim survives summary judgment under the burden shifting paradigm of Title VII and ch. 151B. Because the standard for her ch. 93, § 102 claim is at least as generous to her, this claim also survives. Consequently, I will deny Certified's motion for summary judgment on Count III.

## B. *Discrimination Based on Disability*

### 1. *Chapter 151B*

McDonnell alleges that her termination violates Massachusetts' prohibition on discrimination based on disability. Chapter 151B provides that it is unlawful:

> For any employer ... to ... refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business....

Chapter 151B, § 4(16). The SJC, in *Beal,* outlined the necessary components of a plaintiff's *prima facie* case for a claim of discrimination based on disability:

> In order to establish a prima facie case of unlawful employment discrimination on the basis of handicap pursuant to G.L. c. 151B, a plaintiff must present some evidence

that: (1) she is handicapped; (2) she is a qualified handicapped person and she applied for a position for which the employer was seeking applicants; (3) the employer terminated the plaintiff for the position in spite of her qualifications; (4) after the employer terminated the plaintiff, the position remained open and the employer continued to seek applicants.

419 Mass. at 541, 646 N.E.2d at 136. As in the gender discrimination context, this *prima facie* case must be appropriately adapted to the circumstances of the case. In any formulation, however, the plaintiff must allege that she is disabled and qualified. Based on the reasoning outlined above, part III.A.1.a., the last element of McDonnell's *prima facie* case requires the proffer of evidence that the layoff was not undertaken in a disability neutral manner or otherwise present evidence from which a factfinder might reasonably conclude that the employer intended to discriminate on the basis of disability in reaching its decision to terminate her.

Similarly, "[o]nce the plaintiff establishes a prima facie case of discrimination pursuant to G.L. c. 151B, the burden of production then shifts to the employer 'to articulate a legitimate, nondiscriminatory reason for its action, and to produce credible evidence to show that the reason or reasons advanced were the real reasons.'" *Beal,* 419 Mass. at 540 n. 4, 646 N.E.2d at 136.

Certified challenges the first element of McDonnell's prima facie case—asserting that she has not established that she was a handicapped person (Def.Mem. at 8), or perceived as a handicapped person, *id.* at 9.

McDonnell's disability claim alleges that she was a "handicapped person" as a result of her pregnancy status. (Complaint ¶ 14.) Chapter 151B explains that a handicapped person is a person with a handicap. Mass. Gen.L. ch. 151B, § 1(19). A handicap is: "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment." *Id.* § 1(17).

McDonnell does not adduce any evidence to demonstrate in what way her pregnancy

rendered her disabled. In *Minicucci v. Charles Hotel,* the case upon which McDonnell relies, the MCAD concluded that a pregnant woman who had a physical impairment that substantially limited one or more of her major life activities, came within the definition of a handicapped person under ch. 151B, § 1(17). 9 MDLR 1217, 1218 (1987). The Commission wrote:

> In the instant matter, Complainant has submitted evidence, in the form of a letter from her treating physician, that she was disabled from working for a period of one month due to fatigue and nausea. For this reason, I conclude that Complainant's pregnancy is a physical impairment which limits one or more of her major life activities and is cognizable under Chapter 151B, § 4(16).

*Id.* In supporting its opinion, the Commission cited *School Comm. of Braintree v. MCAD,* 377 Mass. 424, 386 N.E.2d 1251 (1979). In that case, the SJC held that excluding pregnancy related disabilities from those disabilities covered by a short term disability policy, constituted gender discrimination. The Court noted: "we pause to add that a pregnant worker's entitlement to benefits is, of course, limited to that period of time during which she is actually disabled by pregnancy." 377 Mass. at 432, 386 N.E.2d 1251.

■ *Minicucci* and *School Comm. of Braintree,* thus, stand for the proposition that while in some cases pregnancy may render an individual disabled, this disability must be demonstrated; pregnancy is not, *per se,* a disability. McDonnell has offered no evidence to suggest that *her* pregnancy rendered *her* disabled in a particular way.

■ However, McDonnell may also pursue a claim that her discharge was the result of Certified's perception of her as a disabled person. If the decision to terminate McDonnell was made after McDonnell disclosed her pregnancy status, as McDonnell alleges, the question remains whether or not she was terminated because she was perceived as disabled. I find that McDonnell satisfies the first element of the *prima facie* case by alleging that she was perceived as a disabled person. The remainder of the burden shifting analysis is the same as that discussed *supra* part III.A.1. Because there remain questions regarding when the decision to terminate McDonnell was made, summary judgment is inappropriate. Consequently, I will deny Certified's motion for summary judgment on Count II.

#### 2. *Mass.Gen.L. ch. 93, § 103*

McDonnell claims that she "was laid off because of her handicap (pregnancy), in violation of M.G.L. ch. 93, § 103." (Complaint ¶ 22.) Like § 102, § 103 requires a showing comparable to that called for under ch. 151B. *See* discussion *supra* part III.A.2. As such, because McDonnell adequately alleges that she was terminated because she was perceived to be disabled under ch. 151B, her § 103 claim survives summary judgment.

### IV.

In conclusion, for the reasons outlined above, I DENY summary judgment for Certified.