Frank B. WOODMAN, Plaintiff,
Appellant,

v.

HAEMONETICS CORPORATION,
Defendant, Appellee.

No. 94–1727.

United States Court of Appeals,
First Circuit.

Heard Dec. 5, 1994.

Decided April 14, 1995.

Stuart DeBard, Boston, MA, for appellant.

Jeffrey M. Hahn, with whom Foley, Hoag & Eliot was on brief, Boston, MA, for appellee.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Plaintiff Frank B. Woodman appeals from a district court order granting summary judgment for Haemonetics Corporation ("HC"), Woodman's former employer, and dismissing his claim for wrongful discharge under the Age Discrimination in Employment Act ("ADEA"). We vacate the district court judgment and remand for factfinding.

# I

## *BACKGROUND* [1]

Woodman was hired by HC in January 1981 at age forty-eight. For ten years he worked as a machinist, primarily in HC's machine shop at Holbrook, Massachusetts. Throughout his employment as a machinist he consistently earned favorable performance reviews. He was promoted twice, receiving commensurate wage increases from $5.28 per hour as a Machinist Trainee, to $11.75 per hour as a Machinist B.

In December 1990, at age fifty-seven, Woodman was transferred to the "bowl department" in Braintree, Massachusetts, where HC manufactures disposable components for medical equipment designed to facilitate the collection, separation and cleansing of blood and blood constituents. The medical equipment manufactured in the bowl department is fabricated under sterile conditions in a controlled-access area known as the "clean room."

On January 24, 1991, Woodman received a flawless performance report from his bowl department supervisor, Mary LeBlanc. Not only did he earn the highest possible rating in all six review categories, but LeBlanc commented: "[Y]our work since joining bowls has been exceptional. You have made a positive contribution in work and in adapting to change."

Thereafter, in late March 1991, Mary LeBlanc was succeeded by Rick Lucas as Woodman's supervisor in the bowl department. Lucas began training Woodman in two non-assembly line tasks—"material handling" (i.e., retrieving raw materials for use in the clean room) and "bowl packing" (i.e., packaging the finished product). The record discloses but one performance review of Woodman by Lucas, in late July 1991. Though less favorable than the LeBlanc report, the Lucas report indicated that Woodman was performing at an acceptable level. Woodman was rated "exceptional" in terms of dependability and "above average" in terms of both customer/supplier relations and quality of work. In no category did Woodman receive a rating lower than "average." Lucas added, "Frank is a highly organized, consistent performer."

John Barr became Vice President of Operations for HC in mid-September 1991. Shortly thereafter, Barr directed all HC managers to reevaluate their employees, with particular emphasis on flexibility (i.e., susceptibility to cross-training and to multiple production-line responsibilities), reliability, participation (i.e., the capacity to provide suggestions and contribute to improved operational efficiencies) and quality and quantity of work product. The record on appeal does

---

1. The essential facts are recited in the light most favorable to appellant Woodman, the party resisting summary judgment. *Velez–Gomez v. SMA Life Assurance Co.,* 8 F.3d 873, 874 (1st Cir. 1993).

not reflect a performance rating on Woodman under Vice President Barr's revised performance review procedure in the fall of 1991. The record is clear, however, that many HC employees did receive performance ratings considered unacceptable by Barr. The record evidence also discloses that Barr determined that HC could terminate its "C performers" without jeopardizing its production, while dramatically reducing labor costs.

Sometime in the fall of 1991, Mary LeBlanc resumed her supervisory role over Woodman in the bowl department. Around this same time, LeBlanc was privy to at least one discussion, among members of HC's upper management, in which future employee terminations were discussed. Following such a meeting, and in the presence of Woodman, LeBlanc referenced the management discussion relating to future terminations: "These damn people—they want younger people here. They will be the one[s] that will be successful here." Woodman's affidavit attests that LeBlanc made similar statements on several occasions.

During the time that HC's management was deciding which employees were to be terminated, Mary LeBlanc submitted a memorandum, dated November 15, 1991, describing Woodman's work performance as having been unsatisfactory throughout the period "since July 1991." The November 15 memorandum made no reference to the performance review by Lucas in late July 1991. LeBlanc described Woodman as an "unmotivated worker" who "would prefer to sit in the Bowl Prep area and read for extended periods of time up to several hours." She noted further that Woodman was slow, routinely requiring a minimum of thirty minutes to dress for the sterile conditions in the clean room, whereas the requisite procedures should take no longer than ten minutes. LeBlanc reported that Woodman possessed limited skills: "Frank cannot perform 50% of line operations to standard requirement. He can only be assigned 2 off line jobs in the clean room, where his performance will not affect production quantities." Furthermore,

she stated, despite Woodman's training on most assembly-line operations, his inability to perform those operations in a satisfactory manner had led to the abandonment of further training efforts. LeBlanc concluded: "I recommend Frank be relieved from his current duties."

Five days later, in a reduction in force ("RIF"), thirty-three HC employees were terminated; twelve, including Woodman, were bowl department employees. HC presented statistical evidence demonstrating that the ratio of older to younger employees in the bowl department increased slightly during the reduction in force; viz., 41% over age 40 before the RIF; 44% after the RIF.[2]

Woodman received written notice of his immediate termination on November 20, which advised that HC had decided that it could "eliminate a group of its poorest performers and still meet the production plan." Later, HC reported to the Massachusetts Department of Employment Training that Woodman was discharged as part of a reduction in force involving the company's "poorest performers." On March 2, 1993, Woodman initiated the present suit in federal district court, alleging age discrimination in violation of the ADEA.

In due course, the statement attributed to Mary LeBlanc by the Woodman affidavit submitted in opposition to HC's motion for summary judgment was excluded by the district court as inadmissible "totem-pole" (i.e., multiple) hearsay, "unavailing on a motion for summary judgment." The court went on to conclude that though Woodman had made out a prima facie case of age discrimination, HC had rebutted the resulting presumption of unlawful age discrimination by producing enough evidence, if credited, to enable a rational trier of fact to find a nondiscriminatory basis for Woodman's dismissal; viz., poor work performance. Ultimately, the district court awarded summary judgment to HC on the ground that Woodman had not proffered competent evidence sufficient to generate a trialworthy issue as to whether impermissible age-based discrimination constituted a

2. However, since the company-wide data neither support nor undermine the contention that the RIF had no discriminatory impact, additional information would be needed to draw any pertinent conclusion from these data.

determinative factor in the dismissal. Woodman appealed.

## II

### STANDARD OF REVIEW

We examine a grant of summary judgment *de novo*, viewing the evidence, and all reasonable inferences therefrom, in the light most favorable to the party resisting summary judgment. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993). Summary judgment is inappropriate unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 144 (1st Cir.1994). No credibility assessment may be resolved in favor of the party seeking summary judgment. *Velez–Gomez v. SMA Life Assurance Co.*, 8 F.3d 873, 877 (1st Cir.1993).

## III

### DISCUSSION

#### A. *The Burden–Shifting Paradigm*

The burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) ["*McDonnell Douglas*"], and imported for use in ADEA cases, *see Keisling v. SER–Jobs for Progress, Inc.*, 19 F.3d 755, 760 (1st Cir.1994); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994), allocates burdens of production and orders the presentation of evidence so as "progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1095 n. 8, 67 L.Ed.2d 207 (1981); *see St. Mary's Honor Ctr. v. Hicks*, — U.S. —, —, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993).

At the first stage in the *McDonnell Douglas* matrix, Woodman was required to make a prima facie showing that he (1) was at least forty years old, (2) met HC's legitimate job performance expectations, (3) experienced adverse employment action, *and* (4) since the challenged action was part of a *reduction in force*, that HC did not treat age neutrally *or* it retained younger persons in the same position. *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1117 (1st Cir.1993); *LeBlanc*, 6 F.3d at 842. The required prima facie showing is not especially burdensome, *see Greenberg v. Union Camp Corp.*, 48 F.3d 22, 27 (1st Cir.1995); *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 n. 4 (1st Cir.1994), and once established, gives rise to a rebuttable presumption that the employer engaged in intentional age-based discrimination. *Goldman*, 985 F.2d at 1117 (citing *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094). As Justice Scalia stated in *Hicks*, the rebuttable presumption *ultimately* results in "a required conclusion [*viz.*, unlawful discrimination] *in the absence of explanation*." *Hicks*, — U.S. at —, 113 S.Ct. at 2747 (emphasis added).

At the second stage in the burden-shifting praxis, the defendant-employer must produce sufficient competent evidence, "*taken as true*," to *permit* a rational factfinder to conclude that there was a "nondiscriminatory reason," *id.* at —, 113 S.Ct. at 2748 (emphasis in original), for the challenged employment action, thereby displacing the legal presumption of intentional discrimination generated by the plaintiff-employee's prima facie case. *Goldman*, 985 F.2d at 1117. Since neither credibility issues nor other factual matters in genuine dispute are to be resolved under it, "the *McDonnell Douglas* framework ... is no longer relevant" once the defendant-employer has met its burden of production at the second stage. *Hicks*, — U.S. at —, 113 S.Ct. at 2749. The attendant legal presumption of intentional discrimination having served its purpose—that of "forcing the defendant to come forward with some response"—it "drops out of the picture." *Id.*

At that point, the defendant-employer's motion for summary judgment can-

not succeed if the plaintiff-employee, with whom the ultimate burden of *persuasion* remains throughout, *Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 478 (1st Cir.1993), has proffered sufficient admissible evidence, if believed, to prove by a preponderance of the evidence each essential element in a *prima facie* case and that the employer's justification for the challenged employment action was merely a pretext for impermissible age discrimination. *Id.* at 479. The plaintiff-employee may rely upon the same evidence to establish both pretext and discrimination, provided it is adequate to enable a rational factfinder reasonably to infer that intentional age-based discrimination was a determinative factor in the adverse employment action. *Goldman,* 985 F.2d at 1117–18.

■ Where the elements of a sufficient prima facie case combine with the factfinder's belief that the ostensible basis for dismissing the employee was pretextual, "particularly if ... accompanied by a suspicion of mendacity," the factfinder is *permitted* to infer the intentional age-based discrimination required to enable the plaintiff-employee to prevail on the merits. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2749 ("The *factfinder's* disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.") (emphasis added); *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 260 n. 3 (1st Cir.1994). We conclude that Woodman made out just such a case in the district court, thereby *precluding* summary judgment for HC.

### B. *Woodman's Prima Facie Case*

■ The district court correctly concluded that Woodman had established a prima facie case of impermissible age-based discrimination in employment. At age fifty-seven, Woodman was discharged as part of a reduction in force, while younger persons were retained in the bowl department. *See Goldman,* 985 F.2d at 1117. As the district court noted, the only substantial question was whether Woodman had met the employer's legitimate job-performance expectations. Woodman cleared this hurdle with his proffer

of substantial wage increases and ten years of positive performance reviews, blemished by but one negative performance evaluation five days prior to the reduction in force. *See, e.g., Woods,* 30 F.3d at 261 (history of largely favorable performance reviews and extensive experience in industry adequate to generate at least a genuine issue as to plaintiff-employee's ability to meet legitimate job expectations); *Keisling,* 19 F.3d at 760 (similar). It then became incumbent upon HC to rebut the resulting legal presumption that the determining factor in its decision to discharge Woodman was impermissible age-based discrimination.

### C. *HC's Rebuttal*

■ At the *second stage* in the *McDonnell Douglas* analysis, the district court concluded—again correctly—that HC had rebutted the legal presumption of intentional age discrimination with evidence relating to Woodman's work performance since joining the bowl department. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2748 ("By producing *evidence* (whether ultimately persuasive or not) of nondiscriminatory reasons, [defendants] sustained their burden of production...."). Crediting the competent evidence adduced by HC, *see id.,* Woodman's performance in the machine shop may have been very good, but he never mastered the tasks required in the bowl department. Thus, the presumption of unlawful age discrimination vanished from the case. *Id.* at ——, 113 S.Ct. at 2749; *Vega,* 3 F.3d at 479.

In order to *avoid* summary judgment at that point it was essential that Woodman proffer sufficient *competent* evidence to generate a trialworthy issue on the ultimate question whether intentional age-based discrimination was a determinative factor in his dismissal. *Id.*

First, Woodman attacked the final performance evaluation by Mary LeBlanc on November 15, 1991—five days before the reduction in force—by contrasting the laudatory performance review of January 24, 1991, with the final review—less than nine months later—in which LeBlanc's assessment plummeted from high praise to a recommendation that Woodman be relieved of his current duties. The Woodman affidavit itself attested to facts directly contradicting several key

assertions made by LeBlanc in her final work performance evaluation. He also tendered statements from a former supervisor in the machine shop and a former group leader in the bowl department, attesting to the high quality of his work. Second, and most importantly, the Woodman affidavit asserted that Mary LeBlanc had stated in his presence, following a meeting with upper management shortly before HC implemented its reduction in force: "These damn people— they want younger people here. They will be the one[s] that will be successful here."

Under the summary judgment analysis required once the *McDonnell Douglas* framework dropped out of the picture, *see Hicks,* —— U.S. at ——, 113 S.Ct. at 2749, the district court was required to consider whether Woodman presented sufficient *competent, i.e.,* admissible, evidence, *see Murphy v. Timberlane Regional Sch. Dist.,* 22 F.3d 1186, 1196 (1st Cir.) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)), *cert. denied,* —— U.S. ——, 115 S.Ct. 484, 130 L.Ed.2d 396 (1994), to warrant a trial on the ultimate question whether unlawful age-based discrimination was a determinative factor in his dismissal by HC. It was at this juncture that the district court excluded the linchpin in Woodman's opposition to summary judgment—the vicarious admission that Woodman attributed to LeBlanc—as inadmissible "totem-pole" hearsay.

### D. Woodman's Demonstration of Pretext

The twofold thrust implicit in the evidentiary proffers made by Woodman was that the November 15, 1991, LeBlanc memorandum severely denigrating his work performance was a pretext for unlawful age-based discrimination on the part of HC, as indicated not only by Woodman's own work-performance evidence but by the vicarious HC admission, through LeBlanc, that new management disfavored older employees.

The factfinding inquiry into pretext focuses on "whether the *employer believed* its stated reason to be credible." *Goldman,* 985 F.2d at 1118 (quoting *Mesnick v. General Electric Co.,* 950 F.2d 816, 824 (1st Cir.1991)) (emphasis added). Thus, Woodman's evidence, including the vicarious admission made through LeBlanc—if credited by the factfinder—would be adequate not only to *permit* a reasonable inference that HC's articulated justification for Woodman's dismissal was a mere pretext for intentional age discrimination, but also to generate a grave "suspicion of mendacity" respecting the highly unfavorable performance rating made in the LeBlanc memorandum five days prior to Woodman's dismissal. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2749.[3] Consequently, the putative vicarious admission by HC, through LeBlanc, is crucial to our *de novo* determination whether HC was entitled to summary judgment as a matter of law. *See Goldman,* 985 F.2d at 1116.

### (i) The Vicarious Admission

On appeal, HC argues that the excluded statement does not come within Evi-

---

**3.** The statistical evidence presented by HC, in an effort to show that older workers as a whole were *not* more severely affected by the reduction in force, is clearly relevant and might strengthen the employer's defense. *See Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1217 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989) (disparate treatment claim); *see also Connecticut v. Teal,* 457 U.S. 440, 454, 102 S.Ct. 2525, 2534, 73 L.Ed.2d 130 (1982) ("[A] nondiscriminatory 'bottom line' and an employer's good-faith efforts to achieve a nondiscriminatory work force, might in some cases assist an employer in rebutting the inference that particular action had been intentionally discriminatory."). But by itself, rarely will an employer's statistical evidence relating to company-wide workforce composition provide a conclusive defense against a disparate treatment discrimina-

tion claim at summary judgment where the employee has established a prima facie case and pretext accompanied by a suspicion of mendacity. *See Healy,* 860 F.2d at 1218 (expressing skepticism concerning conclusiveness of employer's uncontested data showing no change in workforce composition, both department-wide and company-wide, after reduction in force); *see also Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 579, 98 S.Ct. 2943, 2950–51, 57 L.Ed.2d 957 (1978) ("A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination.") (disparate treatment claim); *Teal,* 457 U.S. at 455, 102 S.Ct. at 2535 ("Congress never intended to give an employer license to discriminate against some employees ... merely because he favorably treats other members of the employees' group.") (disparate impact case).

dence Rule 801(d)(2)(D) because LeBlanc was only a "first-line" supervisor, with no authority to make termination decisions.[4] However that may be, Rule 801(d)(2)(D) does not contemplate—as HC seems to suppose—that the statement be shown to have been made by the employee at the instance of her employer, *compare* Fed.R.Evid. 801(d)(2)(C) *with* Fed.R.Evid. 801(d)(2)(D), but only that the declarant's statement *concern* matters within the scope of her agency or employment. Fed.R.Evid. 801(d)(2)(D). *See, e.g., Union Mut. Life Ins. Co. v. Chrysler Corp.,* 793 F.2d 1, 8–9 (1st Cir.1986); *Hoptowit v. Ray,* 682 F.2d 1237, 1262 (9th Cir.1982).

The record reflects that LeBlanc was acting within the scope of her employment in (i) attending the HC management meeting, (ii) assessing the performance of bowl department employees under her supervision (including Woodman), *and* (iii) in recommending that Woodman be relieved from his duties. Thus, the circumstantial evidence proffered in the Woodman affidavit provided a plainly sufficient foundation, *see* Fed. R.Evid. 103(a)(2), for finding both that LeBlanc was directly involved in the reduction in force and that the excluded statement concerned matters within the scope of her employment. Indeed, any contrary suggestion is belied by HC's firm reliance on LeBlanc's adverse performance evaluation as the principal justification for its decision to terminate Woodman. Finally, the circumstantial evidence proffered in the Woodman affidavit attests, and the excluded statement itself reflects, that LeBlanc purported to be communicating to Woodman information acquired at the HC management meeting.

■ We conclude that though the Woodman affidavit *may* reflect that LeBlanc's description of HC management's attitude toward older workers was predicated on more than one statement made at the management meeting in LeBlanc's presence, her statement to Woodman was not hearsay, even though offered for its truth. *See Hybert v. Hearst Corp.,* 900 F.2d 1050, 1053 (7th Cir.

1990) (finding no error where trial court, in ADEA action, admitted into evidence the statement—made by manager to subordinate—that "it's a concern of some of the guys in New York that some of our people in their sixties are going to be replaced"); *see also Brookover v. Mary Hitchcock Memorial Hosp.,* 893 F.2d 411, 417–18 (1st Cir.1990) (holding that nurses' statements that bed restraints should have been used on patient were made within scope of nurses' employment); *Union Mut. Life Ins. Co.,* 793 F.2d at 8–9 (holding that statement by lower level accountant, charged with preparing billings relating to employer's leases, concerned matter within scope of accountant's employment, in circumstances where information upon which proffered statement was based was located in file in accountant's possession within the scope of employment). Accordingly, the evidentiary ruling constituted an abuse of discretion, as it was based upon a misapplication of Rule 801(d)(2)(D) and resulted in a denial of Woodman's right to trial on the ADEA claim. *See Siegal v. American Honda Motor Co., Inc.,* 921 F.2d 15, 17 (1st Cir.1990).

## IV

### CONCLUSION

■ A rational factfinder could conclude that the erroneously excluded non-hearsay statement attributed to Mary LeBlanc provided cogent evidence probative not only of pretext and impermissible age-based discrimination on the part of HC, *see Goldman,* 985 F.2d at 1117–18 (plaintiff-employee may rely on same evidence to prove both pretext and discrimination), but also of the *untruthfulness* of the LeBlanc performance review immediately preceding Woodman's dismissal. *See Hicks,* —— U.S. ——, 113 S.Ct. at 2749. We express no view whatever on these credibility issues, of course, except to note that at summary judgment such questions were to be resolved in favor of Woodman. *See Velez–Gomez,* 8 F.3d at 877. HC was not enti-

---

4. Rule 801(d)(2)(D) states that
   [a] statement is not hearsay if ... [the] statement is offered against a party and is.... a statement by the party's agent or servant con-

cerning a matter within the scope of the agency or employment, made during the existence of the relationship.

Fed.R.Evid. 801(d)(2)(D) (emphasis added).

tled to summary judgment, given the competent evidentiary proffer that its articulated reason for discharging Woodman was an untruthful pretext for intentional age-based discrimination. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2749. Consequently, the district court judgment must be vacated and the ADEA claim must be remanded for factfinding.

*The district court judgment is vacated. The case is remanded for further proceedings consistent with this opinion. Costs are awarded to appellant.*