John Andres **THORNTON**, Plaintiff,

v.

**HARVARD UNIVERSITY; Harvard Law School; and Massachusetts Educational Financing Authority, Defendants.**

**MASSACHUSETTS EDUCATIONAL FINANCING AUTHORITY,**
Counter–Claimant,

v.

John Andres **THORNTON,**
Counter–Defendant.

**No. CIV. A. 96–10591–GAO.**

United States District Court,
D. Massachusetts.

March 26, 1998.

John Andres Thornton, Miami Beach, FL, pro se.

Robert B. Donin, Harvard University, Office of the General Counsel, Cambridge, MA, John K. Felter, Robert A. Freeman, Thomas M. Hefferon, Goodwin, Procter & Hoar, Marion K. Antonucci, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Harvard University, Harvard Law School, Massachusetts Educational Financing Authority, Defendants.

Marion K. Antonucci, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Massachusetts Educational Financing Authority, Counter–Claimant.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

This action concerns a Harvard Law School ("Harvard") financial aid program by which Harvard helps qualifying graduates repay their educational loans. The plaintiff John Andres Thornton ("Thornton") claims that he was wrongly denied aid under this program. The Court here considers three motions: (1) the Harvard defendants' motion for summary judgment; (2) the defendant Massachusetts Educational Financing Authority's ("MEFA") motion for summary judgment; and (3) MEFA's motion for summary judgment on its counterclaim, seeking a declaration that Thornton is in default and an award of interest and attorney's fees. For the reasons that follow, the court grants summary judgment on Thornton's claims in favor of Harvard and MEFA, and on MEFA's counterclaim in favor of MEFA.

### Background

Following are the relevant facts drawing all reasonable inferences that may be derived from the evidence in a light most favorable to Thornton, the non-moving party. *See Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir.1995).

In 1987, Harvard sent a recruitment catalogue to Thornton. It described a program called the "Low Income Protection Plan" ("LIPP"):

> Recognizing that our graduates have increasingly high educational debt burdens and that a career choice in the public service and some other areas of law will result in relatively low salaries, we established the Low–Income Protection Program (LIPP) in 1978. This program, the first of its type in the country, helps relieve the burden of repayments of educational loans for law school for all graduates in low-paying, law related jobs.[1]

Thornton Aff. Ex. 5 at 13. Relying on this, Thornton decided to apply to Harvard despite its high cost of attendance. Thornton claims he would not have applied to Harvard but for LIPP.

Thornton made no inquiry about LIPP until his third year of law school. In 1991, he asked the LIPP administrator, Mary Magnuson, how to apply for coverage under the plan in the event that his post-law school employment turned out to be "low-income." He was given the 1991–1992 *Low Income Protection Plan Guidelines,* which defined "law-related" employment as requiring that two conditions be met:

> (1) The distinctive intellectual skills acquired in a legal education are generally recognized as useful in the job;
>
> (2) It is not highly unusual for members of the legal profession to hold similar jobs.

Curll Aff. Ex. 5 at 2. Thornton alleges that at this meeting, Thornton told Magnuson that he was considering employment with the foreign service, on Capitol Hill, or as a political reporter. Magnuson told Thornton that she could not pre-approve a claim for any of those jobs. Rather, Thornton would have to obtain his position and a statement from his employer first. Magnuson promised that Harvard would measure his claim against the 1991–1992 definition of "law-related" employment, and pay the claim if his job met that definition. (Thornton Aff. ¶ 22 and Ex. 8).

---

**1.** At that time, Harvard's annual guidelines describing the LIPP program defined "law-related" as "(1) The nature of the work should involve addressing legal problems; (2) The work should require the intellectual skills acquired in a legal education. These skills should be necessary to the work and not incidental to it." According to Thornton, he was unaware of this definition as he had received no document describing the LIPP program except the admissions catalogue.

Thornton took a position as a journalist covering national politics for a Venezuelan newspaper. After moving to Venezuela and beginning work, Thornton applied for LIPP assistance. His initial application stated that he was working as an economic rather than a political reporter. Magnuson discussed the application with Joyce Curll, Assistant Dean of Admissions, and Sally Donahue, Director of Financial Aid (both members of Harvard's Financial Aid Committee). All concluded that a job as an economic reporter for a Venezuelan newspaper was not "law-related" under the LIPP definition, and Magnuson notified Thornton of the denial of his application.

Magnuson then received a letter from the Thornton's editor stating that Thornton was working as a political rather than an economic reporter. Magnuson, Curll, and Donohue concluded that this position also was not "law-related" and Magnuson again notified Thornton that his application had been denied. Thornton telephoned Magnuson and sent several letters protesting the decision and asking that it be reconsidered. In response, Magnuson circulated his application to the Financial Aid Committee faculty members, who agreed that the position did not qualify. Magnuson informed Thornton of the decision.

In June 1993, Thornton accepted a position with a public relations firm in Mexico City. Two months later, he left and accepted a position with a law firm in Miami. Thornton then applied for LIPP benefits for the period from June 1993 to June 1994. Since his Miami law firm position was "law-related" and he satisfied the other LIPP requirements, his application was approved. However, a portion of Thornton's loans were deemed not to be eligible for LIPP repayment because they were "parental replacement loans."[2] Thornton then ceased his loan payments and filed the instant action.

## A. Claims Against Harvard

Thornton's complaint sets forth eleven causes of action against Harvard: breach of contract (Count I); breach of written promise (Count II); unjust enrichment (Count III); fraud (Count IV); negligent misrepresentation (Count V); misleading advertising (Count VI); unauthorized sale of insurance (Count VII); declaratory relief (Count VIII); estoppel (Count IX); unfair claim settlement practices (Count X); breach of implied covenants of good faith and fair dealing (Count XI). Harvard has moved for summary judgment in its favor on all counts. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Woodman* 51 F.3d at 1091. *Contract Claims (Counts I and XI) and Quasi Contract Claims (Counts II, III, and IX)*

Thornton alleges that the LIPP program created a contract between him and Harvard, the terms of which were that "Harvard was obligated to pay Thornton upon his graduation a percentage of his loan payments on the loans he had taken out from Harvard and MEFA up to 100% and depending solely on his income if he took a job that was law-related." Am. Compl. ¶ 89.

Courts have held that the basic legal relationship between students and universities is contractual in nature. *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir.1998); *Russell v. Salve Regina College*, 938 F.2d 315, 316 (1st Cir.1991). "The terms of the

---

2. The LIPP Guidelines for 1991–1992, given to Thornton during his visit to Magnuson's office in the fall of 1991 provide:

> Also effective with loans issued after July 1, 1988, replacement borrowing for imputed parent contributions will be covered to the same extent as if it were authorized as part of the student's financial aid package, but such coverage will be by LIPP interest-free loans for the first three years after graduation and forgiveness thereafter. In order to determine which

loans are replacement borrowing for imputed parent contributions, the appropriate financial aid applications, including parent's information, need to be filed for each of the three years that the student is enrolled at HLS. If parental information is not submitted, we must assume (after considering the student's own resources) that all of the borrowing is replacing a potential parent contribution.

Curll Aff. Ex. 5 at 1.

contract may include statements provided in student manuals and registration materials." *Mangla,* 135 F.3d at 83; *Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir. 1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978). "The proper standard for interpreting the contractual terms is that of 'reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.'" *Mangla,* 135 F.3d at 83 (quoting *Giles v. Howard Univ.,* 428 F.Supp. 603, 605 (D.D.C.1977)).

■ First, Thornton alleges that the description of LIPP in the Application Catalogue created a contract between him and Harvard upon his payment of the deposit. In full, that statement reads:

> We have a long-standing commitment to encourage students to pursue the law-related career of their choice, regardless of salary. Recognizing that our graduates have increasingly high educational debt burdens and that a career choice in the public service and some other areas of law will result in relatively low salaries, we established the Low Income Protection Program (LIPP) in 1978. This program, the first of its type in the country, helps relieve the burden of repayments of educational loans for law school for all graduates in low-paying, law-related jobs.

> LIPP permits participants to apply only a limited percentage of their earnings towards their total annual loan repayment obligations. The Program provides that Harvard Law School will pay any remaining law school loan payments due that year.

> For the year July 1, 1987 through June 30, 1988, the Plan provides that a graduate earning less than $20,000 in a law-related position will allocate 0% of his or her salary toward repaying Harvard Law School debts (i.e., Harvard Law School would pay all such debts that year); at the highest eligible income levels, a graduate earning

between $26,001 and $29,000 contributes 6% of salary, or $130 to $145 per month, toward Harvard Law School debt repayment.

> More information on LIPP is provided in the *Financial Aid Guide.*[3]

Thornton Aff. Ex. 1 at 2. This language creates no "reasonable expectation" that Harvard would find any particular job "law-related" so as to qualify under LIPP. The language explicitly refers the reader to the *Financial Aid Guide* for more information about the program and effectively incorporated the *Financial Aid Guidelines* into any contract that was formed. Those guidelines explicitly reserved the university's "right to change at any time the terms and guidelines for the various aid programs in order to make the best use of funds available." Curll Aff. Ex. 3 at 1.

Thornton alleges a second contract was formed during his visit to Magnuson's office, when she gave him a copy of the *Financial Aid Guidelines* and the LIPP program guidelines, containing an explanation of what "law-related" meant as well as what loans qualified under the program. Notably, those guidelines encouraged students and graduates "who are unsure as to whether their planned employment will meet these criteria to consult with the Student Finances Coordinator." Curll Aff. Ex. 4 at 3. Thornton could not have reasonably assumed that such guidelines created a binding contract such that Harvard was obligated to find him LIPP-eligible for any particular position. Nor could he have reasonably assumed that LIPP would pay for all his loans regardless of what employment he pursued.

■ Moreover, assuming in Thornton's favor that some sort of a contract was formed, there is no evidence of any material breach by Harvard. There can be no serious argument that his employment as a reporter was not "law-related" within the "contract" definition. On the other hand, when Thornton was

---

3. For each year that Thornton attended HLS, page one of each *Financial Aid Guide* notified students that: "All aid programs described in this Guide depend on the availability, or allocation by the Law School, of funds to support them. The Law School reserves the right to change at any time the terms and guidelines for the various aid programs in order to make the best use of funds available." Curll Aff. Ex. 3 at 1.

employed at the Miami law firm, his application was approved under the LIPP program.[4]

◼ Thornton has no claim for breach of contract. For essentially the same reasons that he has no contract claim, he has no claim for breach of the implied covenant of good faith and fair dealing.

◼ Additionally, under the facts as presented in the record, Thornton did not "reasonably rely" on a "promise" that Harvard would find any particular position qualified for LIPP benefits, and his equitable claims (Counts II, III and IX) must therefore also be dismissed, since reasonable reliance is an element of each. *See, e.g., Loranger Constr. Corp. v. E.F. Hauserman Co.,* 6 Mass.App. Ct. 152, 374 N.E.2d 306, 308 (promissory estoppel), *aff'd,* 376 Mass. 757, 384 N.E.2d 176 (1978)); *Cellucci v. Sun Oil Co.,* 2 Mass. App.Ct. 722, 320 N.E.2d 919, 923 (1974) (equitable estoppel).

### Counts IV and V: Fraud and Negligent Misrepresentation

◼ To prove fraud, Thornton must show that Harvard "made a false representation of material fact with knowledge of its falsity for the purpose of inducing him to take action, and that he reasonably relied upon the representation to his detriment." *Doyle v. Hasbro, Inc.,* 884 F.Supp. 35, 40–41 (D.Mass.1995), *aff'd,* 103 F.3d 186 (1st Cir. 1996); *Logan Equip. Corp. v. Simon Aerials, Inc.,* 736 F.Supp. 1188, 1199 (D.Mass.1990). To establish negligent misrepresentation, Thornton need not show that Harvard knew its statement to be false, if a "modicum of diligence" would have revealed the statement's falsity. *Zimmerman v. Kent,* 31 Mass.App.Ct. 72, 575 N.E.2d 70, 74 (1991).

◼ There are two reasons why these counts are meritless. First, there is no indication that Harvard made any statement of fact that was false when it was made. The gist of Thornton's complaint is that Harvard did not live up to its promises. Statements that are promissory in nature are not actionable as fraud or misrepresentation unless it is shown that the promisor had no intention of fulfilling the promise when it was made, so there was a false representation of present intention. *Gerli v. G.K. Hall & Co.,* 851 F.2d 452, 456 (1st Cir.1988). There is no evidence to support that. Second, there is no evidence of any representation that any particular employment would be approved by Harvard for the LIPP program. Thornton could not have reasonably relied on any such assurance, because none was given.

### Remaining Claims

◼ Count VI alleges that Harvard's misleading advertising induced Thornton to apply to and enroll at Harvard Law School. Misleading advertising is not a common law tort except to the extent that it amounts to fraud. A Massachusetts statute, Mass. Gen. L. ch. 266, § 91, prohibits untrue and misleading advertising, but does not provide a private right of action for damages.

◼ Misleading advertising may be actionable under Mass. Gen. L. ch. 93A, which prohibits unfair or deceptive trade practices in the conduct of trade or business, but Harvard's administration of student financial aid is not "trade or commerce" for purposes of chapter 93A. *Linkage Corp. v. Trustees of Boston University,* 425 Mass. 1, 679 N.E.2d 191, 191 (1997) (universities and other charitable institutions do not engage in "trade or commerce" when they undertake activities in furtherance of their core mission, rather than in a "business context"). *See also All Seasons Servs., Inc. v. Commissioner of Health and Hosps., of Boston,* 416 Mass. 269, 620 N.E.2d 778, 779–80 (1993) (statute inapplicable where hospital did not seek to profit from food service contract and food service provision was incidental to hospital's primary activity).

◼ Counts VII and X allege improper insurance practices. They are without merit. By administering the LIPP program, Harvard is not engaged in the business of insurance pursuant to Mass. Gen. L. ch. 176D. *See Poznik v. Massachusetts Medical Professional Ins. Ass'n,* 417 Mass. 48, 628 N.E.2d 1, 2–3 (1994).

---

4. The fact that some of his loans were disqualified under other regulations is inconsequential.

Count VIII requests declaratory relief, to which Thornton is not entitled because none of his substantive claims has merit.

## B. Claims Against MEFA

Thornton's claims against MEFA are premised on the proposition that Harvard acted as MEFA's agent in dealing with Thornton, and thus MEFA is responsible for Harvard's conduct in its administration of LIPP.

First, all of Thornton's claims against MEFA are meritless for the same reasons his claims against Harvard are meritless. In addition, the record does not support the proposition—necessary to his case against MEFA—that Harvard was MEFA's agent as it administered its own LIPP program.

Under Massachusetts law, proof of the existence of an agency relationship requires: (1) the power of the agent to alter the legal relationships between the principal and third parties; (2) the existence of a fiduciary relationship toward the principal with respect to matters within the scope of the agency; and (3) the right of the principal to control the agent's conduct with respect to matters within the scope of the agency. *Sabel v. Mead Johnson & Co.*, 737 F.Supp. 135, 138 (D.Mass.1990) (citing *Restatement (Second) of Agency* §§ 12–14 (1958)). *See also Canney v. City of Chelsea*, 925 F.Supp. 58, 64 (D.Mass.1996).

MEFA is a public instrumentality created by the legislature of the Commonwealth of Massachusetts to provide loans to students attending schools located in Massachusetts. MEFA loans are originated by participating Massachusetts institutions and are purchased upon origination by MEFA. Pursuant to its loan origination agreement, Harvard agrees to observe MEFA's loan guidelines and to cooperate with MEFA with respect to such loans and, "[t]o the extent the institution deems appropriate, notify prospective applicants of the existence and requirements of the loan programs" and to furnish loan application forms "to prospective applicants who request them." MEFA's Mot. Supp. Summ. J., Ex. B, Loan Origination Agreement at 8, § 3.1(a), (b). MEFA

does not require that its loans be subject to Harvard's LIPP program, and the availability of Harvard's LIPP program was not a factor in MEFA's decision to purchase Thornton's loans. Thornton has not offered any facts to show the existence of the factors necessary to infer an agency relationship between MEFA and Harvard. *See American Home Assurance Co. v. Sport Maska, Inc.*, 808 F.Supp. 67, 72 (D.Mass.); *see also Shapiro v. American Home Assurance Co.*, 584 F.Supp. 1245, 1252 (D.Mass.1984).

## C. MEFA's Counterclaims

There is no factual dispute that Thornton has failed to make payments on his two MEFA loans since October 1995 and that he is consequently in default. Summary judgment is appropriate in an action for liability on a promissory note if a plaintiff can show (1) that there is no genuine dispute as to a defendant's liability on the Note, and (2) that the defendant has not presented countervailing facts to demonstrate that he is not liable as appears. *Community Nat'l Bank v. Dawes*, 369 Mass. 550, 340 N.E.2d 877, 879–81 (1976). The elements of *prima facie* liability on a note are valid execution by the defendant and default in payment. *Id.* at 882.

Thornton has admitted in sworn deposition testimony that he executed the Notes. The Notes themselves clearly and unambiguously inform Thornton of their payment terms. Thornton also testified that (i) he agreed to repay MEFA monies loaned to him pursuant to the Notes; (ii) the proceeds of the Notes were paid by MEFA to help finance his HLS education; and (iii) that he agreed to make consecutive monthly payments on the Notes to the MEFA beginning January 1, 1992.

Thornton has failed to set forth specific facts showing that a genuine issue exists for trial. *United States Trust Co. of New York v. Herriott*, 10 Mass.App.Ct. 313, 407 N.E.2d 381, 387 (1980); *Community Nat'l Bank*, 340 N.E.2d at 879. As a consequence, he is liable to MEFA for the unpaid principal and interest due up to the present time. In addition, the Notes executed by Thornton expressly provide:

4. If the holder of this Note hires a collection agency or an attorney to collect any amount owing under this Note, the Borrower or any Co–Signer shall pay all of the holder's costs and expenses, including reasonable attorney's fees, subject to any law limiting the obligation of the Borrower or such Co–Signer to pay such amounts.

It appears that under the terms of the Note, Thornton is liable for the attorneys' fees in this litigation. MEFA may submit an application for fees within twenty-one days of this Order. Thornton may make any contrary submission within fourteen days of the filing of any application by MEFA.

### Conclusion

For the foregoing reasons, the motion of the defendants Harvard Law School and Harvard University for summary judgment is granted; the defendant Massachusetts Educational Financing Authority's motion for summary judgment is granted; and the counter-claimant MEFA's motion is granted, with attorneys' fees to be approved.

SO ORDERED