Federico **GONZALEZ LARTIGUE,**
Plaintiff,

v.

**Togo D. WEST, Jr., Secretary of the Department of Veterans Affairs, Defendant.**

**No. Civ. 00–1126 JP.**

United States District Court,
D. Puerto Rico.

Dec. 4, 2000.

---

Elaine Rodríguez–Frank, San Juan, P.R., for plaintiff.

Fidel A. Sevillano del Río, U.S. Attorney's Office, District of P.R., Hato Rey, P.R., for defendant.

## OPINION AND ORDER

PIERAS, Senior District Judge.

### I. INTRODUCTION

The Court has before it the Motion for Summary Judgment filed by Defendant Togo D. West, Jr., Secretary of the Department of Veterans Affairs (**docket No. 14**); and Plaintiff Federico González Lartigue's Opposition thereto (docket No. 19). This is an action for damages and declaratory relief filed by Plaintiff under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e—2000e–16. Plaintiff also invokes the Court's pendent jurisdiction to assert claims under Puerto Rico law.

In the Complaint, Plaintiff, who is Puerto Rican, alleges that Defendants discriminated against him on account of his national origin when, on June 9, 1997, the Department of Veterans Affairs demoted him from his position as Program Analyst (GS–13) to that of Computer Specialist (GS–11), and reassigned to a continental American certain duties that he previously performed. Defendants move for summary judgment on the grounds that Plaintiff has failed to establish a prima facie case of national origin discrimination. In the alternative, Defendants argue that summary judgment is proper because Defendant reassigned Plaintiff for a legitimate, non-discriminatory reason: inadequate performance.

### II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Pagano v. Frank, 983 F.2d 343, 347 (1st Cir.1993). A fact is material if, based on the substantive law at issue, it might affect the outcome of the case. Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir.1989). A material issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. See Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 24 (1st Cir.1989).

The party filing a motion for summary judgment bears the initial burden of proof to show "an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue for trial. See First Nat'l Bank v. Cities Service Co., 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); Goldman v. First National Bank of Boston, 985 F.2d 1113, 1116 (1st Cir.1993). In discharging this burden, the non-movant may not rest upon mere allegations or denials of the pleadings. See Fed.R.Civ.P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."). On issues where the non-movant bears the ultimate burden of proof, it must present definite, competent evidence to rebut the evidence put forth by the moving party. See Anderson, 477 U.S. at 256–57, 106 S.Ct. at 2514–15. Summary judgment may be appropriate "[e]ven in cases where elusive concepts such as motive or intent are at issue, ... if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Woods v. Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir.1994)

(quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)).

## III. STATEMENT OF UNDISPUTED MATERIAL FACTS

1. The Department of Veterans Affairs was engaged in a nationwide initiative to implement in all Veterans Affairs Medical Centers an automated clinical and financial Decision Support System (DSS). The DSS program was also to be implemented at the Department of Veterans Affairs in San Juan, Puerto Rico ("San Juan VA"), under the supervision of the Assistant Director, Christian Wingire ("Wingire").

2. The implementation of the DSS program was to begin at the San Juan VA in October 1996. Implementation did not begin, however, until January 1997.

3. Wingire arrived in Puerto Rico in December 1996.

4. Plaintiff was considered along with several other candidates, including Mark Ficek, a continental American, as a possible choice to head the implementation of the DSS Program at the San Juan VA.

5. On January 15, 1997, Plaintiff was chosen to head the implementation of the DSS Program as DSS Site Manager.

6. Rather than create a new position, Defendant detailed Plaintiff in his position as Program Analyst (GS–13) from the Information Resources Management (IRM) service to the Office of the Director.

7. Several of the duties required by the detail were already part of Plaintiff's position description.

8. Defendant needed a person to get the DSS program organized and functional; to assess the workload involved, personnel staffing, space and equipment needs; and to prepare position descriptions and recommendations for space and equipment.

9. Wingire told Plaintiff that he was going to be treated as a Service Chief and that Wingire wanted him to attend the meetings and report to him how the program was coming along.

10. Initially, Defendant did not create any new positions to implement the DSS program. Instead, Defendant detailed employees from other work units. Defendant did not want to create permanent positions because that would have meant hiring through the competitive process.

11. Two individuals were working full-time as part of Plaintiff's staff: Monserrate León, as DSS Financial Analyst, and Viola Wiley, as Program Analyst of the DSS Program.

12. Plaintiff expressed to Wingire that additional personnel were needed for the implementation of the DSS Program.

13. León told Plaintiff on several occasions that Plaintiff could help a lot more in the operational aspects of the DSS program. León worked extra hours in an attempt to catch up with the deadlines in the implementation of the DSS program, at times until 2:00 a.m., but never observed Plaintiff staying late.

14. León spoke to Helen Nunci, Human Resources Manager, about the fact that milestones in the implementation of the DSS program were not being met.

15. Wiley complained to Nunci and/or Wingire about her perception that Plaintiff was not committed to the DSS program and did not make an extra effort to comply with the DSS Program implementation deadlines. Wiley sometimes stayed at work until 11:00 p.m. without overtime or compensatory time, with the sole purpose of trying to comply with the DSS program's deadlines, whereas she observed Plaintiff leave work at his regular time, 3:30 p.m.

16. During Plaintiff's tenure as DSS Site Manager, Monica Krieb, DSS Implementation Manager, called Nunci extremely worried at least twice because the San Juan VA was not meeting the milestones for DSS implementation and it was going to be taken out of the DSS program altogether. The San Juan VA would have been the only hospital to be dropped out of DSS.

17. On June 4, 1997, Krieb sent a Mailman (e-mail) message to Wingire that indicated:

> ... any site falling two weeks or more behind the DSS timeline is in jeopardy of being dropped from this implementation round. San Juan is, and has been two weeks and more behind for quite some time.... I would also like to share with you my discussion with your team during the Mapping Training in early May: I overheard your team stating that they could be more then [sic] a month behind without penalty and when I questioned what this information was based on, the site manager [Plaintiff] informed me that they were complex and unique, and would be given special consideration. I informed the team that this was not the case, that they were and had been behind schedule for months based on Charles Cadwallader's comments and reports to me, as well as Mike Sarantopolus [sic] comments and reports, and were in fact in jepordy [sic] of being dropped from round 6 implementation.

18. On June 9, 1997, Wingire signed a Notification of Personnel Action, ending Plaintiff's detail. The letter expressed, in pertinent part:

> This is to offer you a reassignment in lieu of reduction in force procedures.... [T]he primary reason for this action is a lack of substantial progress in the DSS program. The progress reports submitted by Mr. Sarantopoulos, Supplementation Manager, ISI demonstrate we are considerably behind in most of all deadlines that have been established. Your own progress reports have also indicated that deadlines have not been met. Additionally reports from Ms. Monica Krieb, Director Program Management, are that the San Juan VAMC DSS Program was on the verge of being dropped from the system. She indicated she had discussed this with you and the fact that you had been given all the tools that all other VAMC's had been given in order to make DSS work.
>
> On a personal basis, in my discussions with you regarding progress in the program, I have found you to be argumentative. You do not seem to have a good working relationship with your staff, who have voiced complaints regarding your manner of supervision both to the Chief, HRMS and the Medical Center Director.
>
> ...
>
> You are hereby offered the position of Computer Specialist GS 334–11 in Health Administration Information Service. You will maintain your current grade and salary of GS–13/5....

19. The factors taken into consideration by Wingire in removing Plaintiff from the DSS Program were as follows: failure to provide justification for the number of new staff requested, failure to get the DSS Program up and running, the unhappiness of Plaintiff's staff, and Plaintiff's failure to clear correspondence through the Office of the Director before sending it outside of the station.

20. On June 13, 1997, Plaintiff signed, together with Néstor Nieves as his representative, the Notification of

Personnel Action accepting Wingire's offer of the Computer Specialist (GS–11) position. This Notification differed from that first signed by Wingire on June 9, 1997, in that it deleted reference to Plaintiff's performance.

21. The Computer Specialist position that was given to Plaintiff was the position Defendant would have offered Plaintiff in a Reduction in Force if he would have remained as a Program Analyst during the reorganization.

22. After Plaintiff's transfer, the implementation of the DSS program was assigned to the Fiscal Service under the direction of Patricia Kelly, Financial Manager, who is a continental American.

23. Kelly prepared all of the position descriptions and functional statements to justify additional personnel within one week after assuming the duties of the implementation of the DSS program. She also made a functional statement so that Cathy Moore, RN, would join the DSS staff.

24. Subsequently, Kelly transferred to continental United States and the DSS program was moved back to the Office of the Director.

25. On April 12, 1998, Mark Ficek, a continental American, came to occupy the newly-created, permanent position of DSS Manager, with responsibility for the implementation of the DSS program. Ficek was reassigned from Computer Specialist (GS–13) to Management Analyst (GS–13).

26. In June 1997, there were 34 Service Chiefs at the San Juan VA. Of those 34, three were continental Americans, and 31 were Hispanics.

27. Pursuant to VA regulations MP–5, Part I, Chapter 300, 15a–c and Article 12 of the negotiated Master Agreement, employees that were to be detailed to another service had to have a list of duties or a position description. The supervisor is responsible for preparing these documents and submitting them to Human Resources.

28. The average minority population of PATCOB groups in the San Juan Civilian Labor Force for Hispanics was 97% as of September 1996. The San Juan Medical Center employed at that time a total of 98% minority employees.

29. The plaintiff filed an Equal Employment Opportunity (EEO) complaint on August 7, 1997 and an investigative summary and analysis of the EEO complaint was issued on November 3, 1997.

30. Plaintiff voluntarily resigned from his GS–11 position. He is no longer employed by Defendant.

31. Plaintiff is suing only for his June 13, 1997 reassignment.

## IV. DISCUSSION

### A. Legal Framework

Because Plaintiff produces no direct evidence of national origin discrimination in his demotion, the Court applies the McDonnell Douglas burden-shifting framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Dominguez—Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 429 (1st Cir.2000).[1] In *McDonnell Douglas,* the United States Supreme Court established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory treatment cases. The goal of this burden-shifting framework is to " 'progressively . . . sharpen the inquiry into the elusive factual questions of intentional discrimina-

---

**1.** The Court notes the First Circuit's observation that it "regard[s] Title VII, ADEA, ERISA, and FLSA as standing in pari passu and endorse[s] the practice of treating judicial precedents interpreting one such statute as instructive in decisions involving another." *Dominguez—Cruz,* 202 F.3d at 428 n. 2 (quoting *Serapion v. Martinez,* 119 F.3d 982, 985 (1st Cir.1997)).

tion.'" *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

The plaintiff "carr[ies] the initial burden under the statute of establishing a prima facie case of [national origin] discrimination." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. This initial burden is not onerous. *See Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1094. In an employment termination or demotion case, the plaintiff establishes a prima facie case by showing that: (1) the plaintiff is within a protected class; (2) he was performing his job at a level that met the employer's legitimate expectations; (3) he was nevertheless terminated or demoted; and (4) the employer sought someone of roughly equivalent qualifications to perform substantially the same work after his departure. *See Feliciano de La Cruz v. El Conquistador Resort & County Club,* 218 F.3d 1, 5 (1st Cir.2000); *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 673 (1st Cir.1996).

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for discharging the plaintiff. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 899 (1st Cir.1988). "[T]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742. The defendant's burden of producing a valid, non-discriminatory reason for the adverse employment action is a burden of production; the burden of persuasion remains with the plaintiff at all times. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000); *see also Guiller-*

*mety Mendez v. Puerto Rican Cement Co.,* 56 F.Supp.2d 176, 180 (D.Puerto Rico 1999) (Pieras, J.).

Defendant argues that Plaintiff is unable to satisfy the second prong of its prima facie case because Plaintiff was not performing his job at a level that met his employer's legitimate expectations. Defendant further maintains that because Plaintiff's demotion was motivated by a legitimate, nondiscriminatory reason, and because there is insufficient evidence of intentional discrimination to create a genuine issue for the fact-finder, the entry of summary judgment is appropriate. The Court assumes that Plaintiff has met its burden of establishing a prima facie case because, for the reasons that follow, the Court agrees with Defendant that Plaintiff has failed to show a genuine issue of material fact as to pretext or the ultimate issue of discrimination.

Defendant has satisfied its burden of production by offering admissible evidence sufficient for the trier of fact to conclude that it demoted Plaintiff for failing to make substantial progress in the implementation of the DSS program and because Plaintiff did not have a good working relationship with his staff. Defendant's evidence further shows that the San Juan VA was at risk of being dropped out of the DSS program altogether for failure to meet certain benchmarks in the implementation of the DSS program. Accordingly, "'the McDonnell Douglas framework—with its presumptions and burdens'—disappear[s]," and the sole underlying issue of intentional discrimination remains. *Reeves,* —— U.S. at ——, 120 S.Ct. at 2106 (quoting *Hicks,* 509 U.S. at 510, 113 S.Ct. 2742); *see also Rodriguez–Cuervos v. Wal–Mart Stores, Inc.,* 181 F.3d 15, 20 (1st Cir.1999); *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir.1995).

**B. Pretext and Discriminatory Animus**

In the summary judgment context, a plaintiff must show evidence sufficient for

a fact finder to reasonably conclude that the employer's decision to terminate was driven by a discriminatory animus. *See LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 843 (1st Cir.1993). If the record is "devoid of adequate direct or circumstantial evidence of the employer's discriminatory intent," the entry of summary judgment for the employer is appropriate. *See Mulero–Rodriguez,* 98 F.3d at 673 (citing *Pages–Cahue v. Iberia Lineas Aereas de Espana,* 82 F.3d 533, 537 (1st Cir.1996)). A plaintiff may prove intentional discrimination with "evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves,* —— U.S. at ——, 120 S.Ct. at 2106 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093); *see also Lipsett,* 864 F.2d at 899. In *Reeves,* the U.S. Supreme Court held that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation...." 120 S.Ct. at 2108. In other words, a plaintiff need not necessarily produce evidence beyond pretext to prove that the defendant's true reason was discriminatory. Thus, "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 2109. Where, however, the circumstances suggest that the defendant proffered a false explanation for the adverse employment action to conceal something other than discrimination, the inference of discrimination may not exist. *See id.*

In evaluating whether Defendant's stated reason for demoting Plaintiff was pretextual, "the question is not whether [Plaintiff] was actually performing below expectations, but whether [Defendant] believed that [ ]he was." *Feliciano de La Cruz,* 218 F.3d at 7; *see also Mulero–Rodriguez,* 98 F.3d at 674 (explaining that the issue of pretext looks not at whether Defendant's reasons for demoting Plaintiff were real, but "whether the decisionmakers [ ] believed them to be real") (citing

*Woodman,* 51 F.3d at 1093); *Mesnick v. General Electric Co.,* 950 F.2d 816, 824 (1st Cir.1991). To show that Defendant did not believe that Plaintiff's performance was unsatisfactory, Plaintiff offered evidence that the implementation of the DSS program was behind schedule for reasons beyond his control. Plaintiff contends that he made requests to secure space, equipment, and additional staffing for the DSS program, but that due to bureaucratic obstacles and the lack of responsiveness of his supervisor, Wingire, his requests were not approved in a timely fashion. According to Plaintiff, he also attempted to secure overtime pay for his staff, but his request was not approved. Further, Plaintiff points out that the implementation of the DSS program started well behind schedule, that he was given a staff of only two individuals, whereas similar programs were allocated between three and seven full-time staff, and that one member of his staff was inexperienced and the other did not speak English well. Finally, by May 1997, just before his demotion, Plaintiff testified that he was able to get the program within two weeks of the benchmark. With respect to Plaintiff's relationship with his staff, Plaintiff's evidence shows that he was unaware of his staff's dissatisfaction with his working style, and that Defendant never brought those complaints to his attention.

Defendant contests Plaintiff's explanation of who bore the fault for the failure to meet the milestones for the DSS program, offering evidence that Plaintiff never prepared the necessary position descriptions and functional statements to justify the allocation of additional staff, and that Plaintiff failed to meet both the program's established milestones and Plaintiff's own deadlines. Defendant's evidence, uncontested by Plaintiff, further shows that Plaintiff's replacement prepared the position descriptions and functional statements immediately upon assuming the post, and that additional persons were assigned to the DSS program thereafter.

Plaintiff responds that Defendant treated his replacement's requests for additional resources more favorably, and argues that Defendant did not demote Kelly when she fell behind schedule in implementing the DSS program. In other words, Plaintiff maintains that the differential treatment accorded his continental American replacement, Kelly, evidences intentional discrimination. "A claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in all material respects." *Rodriguez–Cuervos,* 181 F.3d at 21 (quoting *Perkins v. Brigham & Women's Hosp.,* 78 F.3d 747, 751 (1st Cir. 1996)). The objects of comparison, however, need not be identical; rather, the Court must weigh whether a "prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Id.* (quoting *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir.1989)). The plaintiff bears the burden of showing that the individuals to be compared "have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992)).

Plaintiff has failed to bear his burden to show that he and Kelly engaged in the same conduct without differentiating or mitigating circumstances. Plaintiff points out that both he and Kelly fell behind schedule in the implementation of the DSS Program, but that Kelly was not demoted. Without more information to fill in the factual background vis-à-vis these two individuals, however, it cannot be said that Plaintiff and Kelly engaged in the same conduct under the similar circumstances. *See Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 16 (1st Cir.1994) ("[T]his sketchy evidence, lacking a sufficient foundation for a legally relevant comparison ... cannot support an inference that [the plaintiff's] dismissal was motivated by discriminatory animus.") Consequently, the fact that Kelly was not demoted does not tend to show that Defendant unlawfully discriminated against Plaintiff.

Having canvassed the evidence before it, the Court finds a recent First Circuit case highly instructive. In *Feliciano de La Cruz,* the plaintiff, who was from Puerto Rico, brought suit for national origin discrimination after she was terminated from her position as the credit manager at El Conquistador, a hotel in Fajardo, Puerto Rico, and replaced with a woman from the Philippines. *Feliciano de La Cruz,* 218 F.3d at 4. El Conquistador alleged that it discharged Feliciano for unsatisfactory job performance, producing evidence that the hotel suffered from numerous financial problems during Feliciano's employment as the hotel's credit manager. *Id.* at 6. To rebut the hotel's stated reason for her termination, Feliciano came forward with evidence that the financial problems at the hotel were not her fault and that the hotel had recognized her good work by giving her a salary increase six months into her tenure, a letter of commendation from El Conquistador's president and, thirteen months into her tenure, but three days before her termination, El Conquistador presented her with a "Pionero Certificate" thanking her for her contributions to the hotel's first-year operations. *Id.* at 4, 7.

The First Circuit concluded that the evidence of pretext was "thin and disputed," but sufficient to survive summary judgment on the issue of pretext. In so finding, the Court held that in viewing the evidence in the light most favorable to Feliciano, "her explanations of the hotel's problems, coupled with the salary raise and commendations, would permit a reasonable trier of fact to infer that El Conquistador did not actually believe that Feliciano was doing her job poorly." *Id.* at 7.

The case at bar is analogous to Feliciano insofar as Plaintiff's defense rests largely on the claim that Plaintiff is not at fault for the problems experienced in implementing the DSS program. To that end, Plaintiff offered evidence that the short-comings of implementation were caused by a deficient

staff and an inability to obtain adequate resources, notwithstanding Plaintiff's efforts. The Court holds, however, that Plaintiff's case falls short of that necessary to survive summary judgment on the issue of pretext for two reasons. First, unlike Feliciano, Plaintiff has offered no evidence that Defendant had recognized Plaintiff's performance as good. Plaintiff attaches the affidavit of Víctor Cruz, who supervised Plaintiff in 1991 when Plaintiff supervised the Budget, Payroll and Auditing areas of the Fiscal Service. Cruz opines that Plaintiff, under Cruz' s supervision, performed his duties excellently. Although Plaintiff may have performed excellently in 1991 under Cruz, past performance is not probative in this case because in 1991, Plaintiff was "working in different capacities ... under different supervisors with different expectations." *Rodriguez–Cuervos,* 181 F.3d at 20. Plaintiff's failure to offer relevant evidence reflecting any positive recognition by Defendant of Plaintiff's performance distinguishes this case from *Feliciano de La Cruz. Cf. Maldonado–Maldonado v. Pantasia Mfg. Corp.,* 956 F.Supp. 73, 77 (D.Puerto Rico 1997) (evidence of employer's recognition of positive performance and lack of evidence indicating official displeasure with employee's performance sufficient to create an issue of fact concerning adequacy of employee's performance). Second, it is uncontested that Plaintiff's staff voiced complaints about Plaintiff's working style, perceived that he was not committed to the DSS Program, and complained about him and his failure to meet implementation milestones to Wingire and Nunci. Thus, Plaintiff has framed no disputed issue of fact concerning Wingire's perception that Plaintiff did not have a good working relationship with his staff. Whereas the First Circuit found the evidence presented in Feliciano barely sufficient to survive summary judgment, the evidence offered here is even more attenuated. The Court therefore concludes, due to the lack of admissible evidence in the record to create a genuine issue as to whether Defendant did not believe that Plaintiff was perform-

ing below expectations and had a poor working relationship with his staff, it cannot be said that Defendant's stated reason was pretextual.

Evidence that the employer's explanation is unworthy of credence constitutes but one form of circumstantial evidence probative of intentional discrimination. *See Reeves,* —— U.S. at ——, 120 S.Ct. at 2106. There are many forms of circumstantial evidence that a plaintiff may present to show that an employment decision was based on unlawful discrimination. This evidence includes, but is not limited to, "statistical evidence showing disparate treatment by the employer of members of the protected class, comments by decisionmakers which denigrate those in the protected class, differential treatment in the workplace, and the replacement of plaintiff by someone outside of the protected class." *Guillermety Mendez,* 56 F.Supp.2d at 181 (citing *Mesnick v. General Electric Co.,* 950 F.2d 816, 824 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992)); *see also Fernandes v. Costa Bros. Masonry, Inc.,* 199 F.3d 572, 581 (1st Cir.1999).

The only evidence offered by Plaintiff on the ultimate issue of discrimination consists of Plaintiff's replacement by a continental American. Plaintiff also states conclusorily that the Department of Veterans Affairs is "biased against Puerto Rico," but fails to specify how this bias was manifested. Plaintiff has produced no statistical evidence showing disparate treatment by Defendant of Puerto Ricans. To the contrary, it is undisputed that in June 1997, 31 of the 34 service chiefs at the San Juan VA were Hispanic, and that in September 1996, 98% of the employees at the San Juan VA were minorities. Nor has Plaintiff presented proof of comments by decisionmakers that denigrated Hispanics, or competent evidence of differential treatment of Hispanics at the San Juan VA.

While Plaintiff's replacement by someone outside of the protected class is relevant to the question of intentional discrimination, this evidence standing alone, and in

light of the "aggregate package of proof" before this Court, would not permit a factfinder reasonably to infer that unlawful discrimination was a determinative factor in Defendant's employment decision. *Mesnick,* 950 F.2d at 824 (court must look at the totality of the evidence when deciding motion for summary judgment in employment discrimination case). To prevail on a Title VII claim, "the evidence must permit a factfinder reasonably to infer that unlawful discrimination was a determinative factor in the employer's decision." *Feliciano de La Cruz,* 218 F.3d at 8 (citing *Thomas,* 183 F.3d at 57). Because the evidence in the record fails to support an inference of unlawful discrimination against Plaintiff on account of his national origin, the entry of summary judgment in favor of Defendant is appropriate. *See id.; Guillermety Mendez,* 56 F.Supp.2d at 183.

## V. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED.**